573 A.2d 1235 (1990)
In re A.C., Appellant.
No. 87-609.
District of Columbia Court of Appeals.
Argued En Banc September 22, 1988.
Decided April 26, 1990.
*1236 Robert E. Sylvester, Washington, D.C., and Lynn M. Paltrow, with whom Dawn Johnsen, Janet Benshoof, New York City, Rachael N. Pine, Leslie A. Harris, Arthur B. Spitzer, and Elizabeth Symonds, Washington, D.C., were on the brief, for appellant A.C.
Barbara F. Mishkin, with whom Steven J. Routh and Katie G. Lewis, Washington, D.C., were on the brief, for appellee L.M.C.
Vincent C. Burke, III, with whom Jack M.H. Frazier, Washington, D.C., was on the brief, for appellee George Washington University.
Carter G. Phillips, Washington, D.C., with whom Elizabeth H. Esty, Mark E. Haddad, Boston, Mass., David Orentlicher, Washington, D.C., Kirk B. Johnson, Edward B. Hirshfeld, Chicago, Ill., Ann E. Allen, John Lewis Smith, III and James E. Cervenak, Washington, D.C., were on the brief, for the American Medical Ass'n, the American College of Obstetricians and Gynecologists, and the Medical Soc. of the Dist. of Columbia, as amici curiae.
Frederick D. Cooke, Jr., Corp. Counsel, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., filed a statement in lieu of brief, for appellee Dist. of Columbia.
Sarah E. Burns, Washington, D.C., Alison C. Wetherfield, Marion B. Stillson, and Dale Schroedel filed a brief, for the NOW Legal Defense and Educ. Fund, et al., as amici curiae.
Lawrence J. Nelson and H. Westley Clark filed a brief, for the American Soc. of Law and Medicine, et al., as amici curiae.
Loren Kieve, Washington, D.C., John H. Hall, Mary Sue Henifin, Walter J. Walsh, James B. Henly, New York City, and Nadine Taub, Newark, N.J., filed a brief, for *1237 the American Public Health Ass'n as amicus curiae.
James M. Thunder, Cleveland, Ohio, Clarke D. Forsythe, Chicago, Ill., Ann-Louise Lohr, and Edward R. Grant filed a brief, for the Americans United for Life Legal Defense Fund as amicus curiae.
Mark E. Chopko and Helen M. Alvare, Philadelphia, Pa., filed a brief, for the United States Catholic Conference as amicus curiae.
Giles R. Scofield, III, and Nancy D. Polikoff filed a memorandum, for Concern for Dying as amicus curiae.
Fenella Rouse, Elena Cohen, New York City, M. Rose Gasner, and Mark D. Schneider, Washington, D.C., filed a memorandum, for the Soc. for the Right to Die as amicus curiae.
Before ROGERS, Chief Judge,[*] NEWMAN, FERREN, BELSON, TERRY, STEADMAN and SCHWELB, Associate Judges, and MACK, Senior Judge.[**]

ON HEARING EN BANC
TERRY, Associate Judge:
This case comes before the court for the second time. In In re A.C., 533 A.2d 611 (D.C.1987), a three-judge motions division denied a motion to stay an order of the trial court which had authorized a hospital to perform a caesarean section on a dying woman in an effort to save the life of her unborn child. The operation was performed, but both the mother and the child died. A few months later, the court ordered the case heard en banc and vacated the opinion of the motions division. In re A.C., 539 A.2d 203 (D.C.1988). Although the motions division recognized that, as a practical matter, it "decided the entire matter when [it] denied the stay," 533 A.2d at 613, the en banc court has nevertheless heard the full case on the merits.[1]
We are confronted here with two profoundly difficult and complex issues. First, we must determine who has the right to decide the course of medical treatment for a patient who, although near death, is pregnant with a viable fetus. Second, we must establish how that decision should be made if the patient cannot make it for herself  more specifically, how a court should proceed when faced with a pregnant patient, in extremis, who is apparently incapable of making an informed decision regarding medical care for herself and her fetus. We hold that in virtually all cases the question of what is to be done is to be decided by the patient  the pregnant woman  on behalf of herself and the fetus. If the patient is incompetent or otherwise unable to give an informed consent to a proposed course of medical treatment, then her decision must be ascertained through the procedure known as substituted judgment. Because the trial court did not follow that procedure, we vacate its order and remand the case for further proceedings.[2]

*1238 I
This case came before the trial court when George Washington University Hospital petitioned the emergency judge in chambers for declaratory relief as to how it should treat its patient, A.C., who was close to death from cancer and was twenty-six and one-half weeks pregnant with a viable fetus. After a hearing lasting approximately three hours, which was held at the hospital (though not in A.C.'s room), the court ordered that a caesarean section be performed on A.C. to deliver the fetus. Counsel for A.C. immediately sought a stay in this court, which was unanimously denied by a hastily assembled division of three judges. In re A.C., 533 A.2d 611 (D.C.1987). The caesarean was performed, and a baby girl, L.M.C., was delivered. Tragically, the child died within two and one-half hours, and the mother died two days later.
Counsel for A.C. now maintain that A.C. was competent and that she made an informed choice not to have the caesarean performed. Given this view of the facts, they argue that it was error for the trial court to weigh the state's interest in preserving the potential life of a viable fetus against A.C.'s interest in having her decision respected. They argue further that, even if the substituted judgment procedure had been followed, the evidence would necessarily show that A.C. would not have wanted the caesarean section. Under either analysis, according to these arguments, the trial court erred in subordinating A.C.'s right to bodily integrity in favor of the state's interest in potential life. Counsel for the hospital and for L.M.C. contend, on the other hand, that A.C. was incompetent to make her own medical decisions and that, under the substituted judgment procedure, the evidence clearly established that A.C. would have consented to the caesarean. In the alternative, counsel for L.M.C. argues that even if L.M.C.'s interests and those of the state were in conflict with A.C.'s wishes, it was proper for the trial court to balance their interests and resolve the conflict in favor of surgical intervention.
We do not accept any of these arguments because the evidence, realistically viewed, does not support them.

II
A.C. was first diagnosed as suffering from cancer at the age of thirteen. In the ensuing years she underwent major surgery several times, together with multiple radiation treatments and chemotherapy. A.C. married when she was twenty-seven, during a period of remission, and soon thereafter she became pregnant. She was excited about her pregnancy and very much wanted the child. Because of her medical history, she was referred in her fifteenth week of pregnancy to the high-risk pregnancy clinic at George Washington University Hospital.
On Tuesday, June 9, 1987, when A.C. was approximately twenty-five weeks pregnant, she went to the hospital for a scheduled check-up. Because she was experiencing pain in her back and shortness of breath, an x-ray was taken, revealing an apparently inoperable tumor which nearly filled her right lung. On Thursday, June 11, A.C. was admitted to the hospital as a patient. By Friday her condition had temporarily improved, and when asked if she really wanted to have her baby, she replied that she did.
Over the weekend A.C.'s condition worsened considerably. Accordingly, on Monday, June 15, members of the medical staff treating A.C. assembled, along with her family, in A.C.'s room. The doctors then informed her that her illness was terminal, and A.C. agreed to palliative treatment designed to extend her life until at least her twenty-eighth week of pregnancy. The "potential outcome [for] the fetus," according to the doctors, would be much better at twenty-eight weeks than at twenty-six weeks if it were necessary to "intervene." A.C. knew that the palliative treatment she *1239 had chosen presented some increased risk to the fetus, but she opted for this course both to prolong her life for at least another two weeks and to maintain her own comfort. When asked if she still wanted to have the baby, A.C. was somewhat equivocal, saying "something to the effect of `I don't know, I think so.'" As the day moved toward evening, A.C.'s condition grew still worse, and at about 7:00 or 8:00 p.m. she consented to intubation to facilitate her breathing.
The next morning, June 16, the trial court convened a hearing at the hospital in response to the hospital's request for a declaratory judgment. The court appointed counsel for both A.C. and the fetus, and the District of Columbia was permitted to intervene for the fetus as parens patriae. The court heard testimony on the facts as we have summarized them, and further testimony that at twenty-six and a half weeks the fetus was viable, i.e., capable of sustained life outside of the mother, given artificial aid. A neonatologist, Dr. Maureen Edwards, testified that the chances of survival for a twenty-six-week fetus delivered at the hospital might be as high as eighty percent, but that this particular fetus, because of the mother's medical history, had only a fifty to sixty percent chance of survival.[3] Dr. Edwards estimated that the risk of substantial impairment for the fetus, if it were delivered promptly, would be less than twenty percent. However, she noted that the fetus' condition was worsening appreciably at a rapid rate, and another doctor  Dr. Alan Weingold, an obstetrician who was one of A.C.'s treating physicians  stated that any delay in delivering the child by caesarean section lessened its chances of survival.
Regarding A.C.'s ability to respond to questioning and her prognosis, Dr. Louis Hamner, another treating obstetrician, testified that A.C. would probably die within twenty-four hours "if absolutely nothing else is done.... As far as her ability to interact, she has been heavily sedated in order to maintain her ventilatory function. She will open her eyes sometimes when you are in the room, but as far as her being able to ... carry on a meaningful-type conversation... at this point, I don't think that is reasonable." When asked whether reducing her medication to "permit recovery of enough cognitive function on her part that we could get any sense from her as to what her preference would be as to therapy," Dr. Hamner replied, "I don't think so. I think her respiratory status has deteriorated to the point where she is [expending] an enormous amount of energy just to keep the heart going." Dr. Weingold, asked the same question, gave a similar answer: that A.C.'s few remaining hours of life "will be shortened by attempting to raise her level of consciousness because that is what is keeping her, in a sense, physiologically compliant with the respirator. If you remove that, then I think that will shorten her survival."
There was no evidence before the court showing that A.C. consented to, or even contemplated, a caesarean section before her twenty-eighth week of pregnancy. There was, in fact, considerable dispute as to whether she would have consented to an immediate caesarean delivery at the time the hearing was held. A.C.'s mother opposed surgical intervention, testifying that A.C. wanted "to live long enough to hold that baby" and that she expected to do so, "even though she knew she was terminal." Dr. Hamner testified that, given A.C.'s medical problems, he did not think she would have chosen to deliver a child with a substantial degree of impairment. Asked whether A.C. had been "confronted with the question of what to do if there were a choice that ultimately had to be made between her own life expectancy and that of her fetus," he replied that the question "was addressed [but] at a later gestational age. We had talked about the possibility at twenty-eight weeks, if she had to be intubated, if this was a terminal event, would we intervene, and the expression was yes, that we would, because we felt at *1240 twenty-eight weeks we had much more to offer as far as taking care of the child." Finally, Dr. Hamner stated that "the department as a whole" concluded that "we should abide by the wishes of the family." Dr. Lawrence Lessin, an oncologist and another of A.C.'s treating physicians, testified that in meetings with A.C. he had heard nothing to indicate that, if faced with the decision, she would have refused permission for a caesarean section. Dr. Weingold opposed the operation because he believed A.C. had not seriously considered that she might not survive the birth of her baby. Dr. Weingold made explicit what was implicit in Dr. Hamner's testimony: that "in dealing with her, a message that was sent to her was that the earliest we would feel comfortable in intervening, should there be indication as to either maternal or fetal grounds, would be twenty-eight weeks."
After hearing this testimony[4] and the arguments of counsel, the trial court made oral findings of fact. It found, first, that A.C. would probably die, according to uncontroverted medical testimony, "within the next twenty-four to forty-eight hours"; second, that A.C. was "pregnant with a twenty-six and a half week viable fetus who, based upon uncontroverted medical testimony, has approximately a fifty to sixty percent chance to survive if a caesarean section is performed as soon as possible"; third, that because the fetus was viable, "the state has [an] important and legitimate interest in protecting the potentiality of human life"; and fourth, that there had been some testimony that the operation "may very well hasten the death of [A.C.]," but that there had also been testimony that delay would greatly increase the risk to the fetus and that "the prognosis is not great for the fetus to be delivered post-mortem...." Most significantly, the court found:
The court is of the view that it does not clearly know what [A.C.'s] present views are with respect to the issue of whether or not the child should live or die. She's presently unconscious. As late as Friday of last week, she wanted the baby to live. As late as yesterday, she did not know for sure.
Having made these findings of fact and conclusions of law, and expressly relying on In re Madyun, 114 Daily Wash.L.Rptr. 2233 (D.C.Super.Ct. July 26, 1986),[5] the court ordered that a caesarean section be performed to deliver A.C.'s child.
The court's decision was then relayed to A.C., who had regained consciousness. When the hearing reconvened later in the day, Dr. Hamner told the court:
I explained to her essentially what was going on.... I said it's been deemed we should intervene on behalf of the baby by caesarean section and it would give it the only possible chance of it living. Would you agree to this procedure? She said yes. I said, do you realize that you may not survive the surgical procedure? She said yes. And I repeated the two questions to her again [and] asked her did she understand. She said yes. [Emphasis added.]
When the court suggested moving the hearing to A.C.'s bedside, Dr. Hamner discouraged the court from doing so, but he and Dr. Weingold, together with A.C.'s mother and husband, went to A.C.'s room to confirm her consent to the procedure. What happened then was recounted to the court a few minutes later:
THE COURT: Will you bring us up to date? Did you have a conversation with [A.C.]?
DR. WEINGOLD: I did not. I observed the conversation between Dr. Hamner and [A.C.]. Dr. Hamner went into the room to attempt to verify his previous discussion with the patient, with the patient's husband at her right hand and her mother at her left hand. He, to my satisfaction, clearly communicated with [A.C.]. She understood.
THE COURT: You could hear what the parties were saying to one another?

*1241 DR. WEINGOLD: She does not make sound because of the tube in her windpipe. She nods and she mouths words. One can see what she's saying rather readily. She asked whether she would survive the operation. She asked [Dr.] Hamner if he would perform the operation. He told her he would only perform it if she authorized it but it would be done in any case. She understood that. She then seemed to pause for a few moments and then very clearly mouthed words several times, I don't want it done. I don't want it done. Quite clear to me.
I would obviously state the obvious and that is this is an environment in which, from my perspective as a physician, this would not be an informed consent one way or the other. She's under tremendous stress with the family on both sides, but I'm satisfied that I heard clearly what she said.
THE COURT: Dr. Hamner, did you wish to elaborate?
DR. HAMNER: That's accurate. I noticed she was much more alert than she had been earlier in the day and was responding to the nurses in the room as well as to all the physicians and went through the same sequence Dr. Weingold noted. [Emphasis added.]
Dr. Weingold later qualified his opinion as to A.C.'s ability to give an informed consent, stating that he thought the environment for an informed consent was non-existent because A.C. was in intensive care, flanked by a weeping husband and mother. He added:
I think she's in contact with reality, clearly understood who Dr. Hamner was. Because of her attachment to him [she] wanted him to perform the surgery. Understood he would not unless she consented and did not consent.
That is, in my mind, very clear evidence that she is responding, understanding, and is capable of making such decisions.
Dr. Hamner stated that the sedation had "worn off enough for her to wake up to this state" and that "the level of drugs in her body is much different from several hours ago." Consequently, despite A.C.'s continued sedation, Dr. Weingold said that she was "quite reactive," and Dr. Hamner concurred.
After hearing this new evidence, the court found that it was "still not clear what her intent is" and again ordered that a caesarean section be performed. A.C.'s counsel sought a stay in this court, which was denied. In re A.C., 533 A.2d 611, 613 (D.C.1987). The operation took place, but the baby lived for only a few hours, and A.C. succumbed to cancer two days later.

III
The reader may wonder why we are issuing an en banc opinion in this case despite its apparent mootness.[6] The case is moot only in the sense that the surgery which was ordered in this case has been performed, and no decision of ours can put the parties in the same position in which they found themselves before the trial court's order was issued. Otherwise the case is not moot, because collateral consequences will flow from any decision we make in this appeal.
The personal representative of A.C.'s estate has filed an action separate from this appeal against the hospital, based on the events leading to the trial court's order in this case. In these circumstances we adhere to our prior decisions refusing to dismiss an appeal as moot when resolution of the legal issues might affect a separate action, actual or prospective, between the parties. See Kopff v. District of Columbia Alcoholic Beverage Control Board, supra note 6, 381 A.2d at 1378; Saunders v. First National Realty Corp., 245 A.2d 836, 837 (D.C.1968), aff'd in relevant part *1242 sub nom. Javins v. First National Realty Corp., 138 U.S.App.D.C. 369, 371 n. 5, 428 F.2d 1071, 1073 n. 5, cert. denied, 400 U.S. 925, 91 S.Ct. 186, 27 L.Ed.2d 185 (1970); Brown v. Southall Realty Co., 237 A.2d 834, 835-836 (D.C.1968); cf. Super Tire Engineering Co. v. McCorkle, 416 U.S. 115, 121-122, 94 S.Ct. 1694, 1697-98, 40 L.Ed.2d 1 (1974). Any right of action that A.C. may have had against the hospital as a result of the events that culminated in the trial court's order has probably survived her and may still be asserted by her estate (assuming that it is not otherwise subject to dismissal or barred for other reasons). See D.C.Code § 12-101 (1989) (survival statute).
Even if this case were truly moot and had no collateral consequences, we would nevertheless elect to hear it because what occurred here is "capable of repetition, yet evading review." Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911); see Lynch v. United States, 557 A.2d 580, 582-583 (D.C.1989) (en banc); United States v. Edwards, 430 A.2d 1321, 1324 n. 2 (D.C.1981) (en banc), cert. denied, 455 U.S. 1022, 102 S.Ct. 1721, 72 L.Ed.2d 141 (1982). See generally Alton & Southern Ry. v. International Ass'n of Machinists, 150 U.S.App.D.C. 36, 463 F.2d 872 (1972). The challenged action here is not just the trial court's order but the hospital's handling of the medical emergency, which necessarily was too short to be fully litigated, given A.C.'s rapidly declining condition. Additionally, this is a suit for a declaratory judgment, in which the plaintiff is not A.C. but the hospital. Because the hospital operates a high-risk pregnancy clinic, it will in all likelihood again face a situation in which a pregnant but dying patient is either incapable of consenting to treatment or affirmatively refusing treatment. Indeed, any hospital in the District of Columbia may find itself in the same situation, even one without a specialized facility for such patients. There is thus a reasonable expectation that the challenged action in this case  i.e., the hospital's decision to seek judicial authorization for a medical procedure affecting a pregnant patient in extremis  may occur again. See Honig v. Doe, 484 U.S. 305, 108 S.Ct. 592, 601-602 & n. 6, 98 L.Ed.2d 686 (1988). Accordingly, we conclude that we should entertain this appeal in the exercise of our discretion, even assuming that it is partially or wholly moot.

IV
Although we decide this case on the merits of the legal issues, it is important to remember that factual disputes dominate this controversy and determine how the legal issues are framed. It is, of course, beyond dispute that the trial court's findings of fact are binding on this court unless clearly erroneous. D.C.Code § 17-305(a) (1989); see, e.g., Bell v. Jones, 523 A.2d 982, 992 (D.C.1986). Sitting as an appellate court, we cannot engage in fact-finding. See Harmatz v. Zenith Radio Corp., 265 A.2d 291, 292 (D.C.1970). With these preliminary observations, we proceed to address the issues as we understand them.

A. Informed Consent and Bodily Integrity

A number of learned articles have been written about the propriety or impropriety of court-ordered caesarean sections. E.g., Johnsen, The Creation of Fetal Rights: Conflicts with Women's Constitutional Rights to Liberty, Privacy, and Equal Protection, 95 YALE L.J. 599 (1986); Kolder, Gallagher & Parsons, Court-Ordered Obstetrical Interventions, 316 NEW ENG. J. MED. 1192 (1987) (hereafter Obstetrical Interventions); Rhoden, The Judge in the Delivery Room: The Emergence of Court-Ordered Caesareans, 74 CAL.L.REV. 1951 (1986); Robertson, Procreative Liberty and the Control of Conception, Pregnancy, and Childbirth, 69 VA.L.REV. 405 (1983). Commentators have also considered how medical decisions for incompetent persons which may involve some detriment or harm to them should be made. E.g., Pollock, Life and Death Decisions: Who Makes Them and by What Standards?, 41 RUTGERS L.REV. 505, 518-540 (1989); Robertson, Organ Donations by Incompetents and the Substituted Judgment *1243 Doctrine, 76 COLUM.L.REV. 48 (1976). These and other articles demonstrate the complexity of medical intervention cases, which become more complex with the steady advance of medical technology. From a recent national survey, it appears that over the five years preceding the survey there were thirty-six attempts to override maternal refusals of proposed medical treatment, and that in fifteen instances where court orders were sought to authorize caesarean interventions, thirteen such orders were granted. Obstetrical Interventions, supra, 316 NEW ENG. J. MED. at 1192-1193. Compare Goldberg, Medical Choices During Pregnancy: Whose Decision Is It Anyway?, 41 RUTGERS L.REV. 591, 609 (1989) (finding twelve such cases). Nevertheless, there is only one published decision from an appellate court that deals with the question of when, or even whether, a court may order a caesarean section: Jefferson v. Griffin Spalding County Hospital Authority, 247 Ga. 86, 274 S.E.2d 457 (1981).
Jefferson is of limited relevance, if any at all, to the present case. In Jefferson there was a competent refusal by the mother to undergo the proposed surgery, but the evidence showed that performance of the caesarean was in the medical interests of both the mother and the fetus.[7] In the instant case, by contrast, the evidence is unclear as to whether A.C. was competent when she mouthed her apparent refusal of the caesarean ("I don't want it done"), and it was generally assumed that while the surgery would most likely be highly beneficial to the fetus, it would be dangerous for the mother. Thus there was no clear maternal-fetal conflict in this case arising from a competent decision by the mother to forego a procedure for the benefit of the fetus. The procedure may well have been against A.C.'s medical interest, but if she was competent and given the choice, she may well have consented to an operation of significant risk to herself in order to maximize her fetus' chance for survival. From the evidence, however, we simply cannot tell whether she would have consented or not.
Thus our analysis of this case begins with the tenet common to all medical treatment cases: that any person has the right to make an informed choice, if competent to do so, to accept or forego medical treatment. The doctrine of informed consent, based on this principle and rooted in the concept of bodily integrity, is ingrained in our common law. See Crain v. Allison, 443 A.2d 558, 561-562 (D.C.1982); Canterbury v. Spence, 150 U.S.App.D.C. 263, 271, 464 F.2d 772, 780, cert. denied, 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972); Schloendorff v. Society of New York Hospital, 211 N.Y. 125, 127, 105 N.E. 92, 93 (1914). Under the doctrine of informed consent, a physician must inform the patient, "at a minimum," of "the nature of the proposed treatment, any alternative treatment procedures, and the nature and degree of risks and benefits inherent in undergoing and in abstaining from the proposed treatment." Crain v. Allison, supra, 443 A.2d at 562 (footnote omitted). To protect the right of every person to bodily integrity, courts uniformly hold that a surgeon who performs an operation without the patient's consent may be guilty of a battery, Canterbury v. Spence, supra, 150 U.S.App.D.C. at 274, 464 F.2d at 783, or that if the surgeon obtains an insufficiently informed consent, he or she may be liable for negligence. Crain v. Allison, supra, 443 A.2d at 561-562. Furthermore, the right to informed consent "also encompasses a right to informed refusal." In re Conroy, 98 N.J. 321, 336, 486 A.2d 1209, 1222 (1985) (citation omitted).
In the same vein, courts do not compel one person to permit a significant intrusion *1244 upon his or her bodily integrity for the benefit of another person's health. See, e.g., Bonner v. Moran, 75 U.S.App.D.C. 156, 157, 126 F.2d 121, 122 (1941) (parental consent required for skin graft from fifteen-year-old for benefit of cousin who had been severely burned); McFall v. Shimp, 10 Pa.D. & C.3d 90 (Allegheny County Ct. 1978). In McFall the court refused to order Shimp to donate bone marrow which was necessary to save the life of his cousin, McFall:
The common law has consistently held to a rule which provides that one human being is under no legal compulsion to give aid or to take action to save another human being or to rescue .... For our law to compel defendant to submit to an intrusion of his body would change every concept and principle upon which our society is founded. To do so would defeat the sanctity of the individual, and would impose a rule which would know no limits, and one could not imagine where the line would be drawn.
Id. at 91 (emphasis in original). Even though Shimp's refusal would mean death for McFall, the court would not order Shimp to allow his body to be invaded. It has been suggested that fetal cases are different because a woman who "has chosen to lend her body to bring [a] child into the world" has an enhanced duty to assure the welfare of the fetus, sufficient even to require her to undergo caesarean surgery. Robertson, Procreative Liberty, supra, 69 VA.L.REV. at 456. Surely, however, a fetus cannot have rights in this respect superior to those of a person who has already been born.[8]
Courts have generally held that a patient is competent to make his or her own medical choices when that patient is capable of "the informed exercise of a choice, and that entails an opportunity to evaluate knowledgeably the options available and the risks attendant upon each." Canterbury v. Spence, supra, 150 U.S.App.D.C. at 271, 464 F.2d at 780. Thus competency in a case such as this turns on the patient's ability to function as a decision-maker, acting in accordance with her preferences and values. United States v. Charters, 829 F.2d 479, 495-497 & nn. 23-26 (4th Cir. 1987) (competency to make treatment decisions depends on whether the patient is able to make a rational choice based on reason), on rehearing en banc, 863 F.2d 302 (1988); In re Farrell, 108 N.J. 335, 354 & n. 7, 529 A.2d 404, 413 & n. 7 (1987) ("A competent patient has a clear understanding of the nature of his or her illness and prognosis, and of the risks and benefits of the proposed treatment, and has the capacity to reason and make judgments about that information" (citations omitted)); accord, PRESIDENT'S COMMISSION FOR THE STUDY OF ETHICAL PROBLEMS IN MEDICINE AND BIOMEDICAL AND BEHAVIORAL RESEARCH, DECIDING TO FOREGO LIFE-SUSTAINING TREATMENT 123 (1983) (hereafter 1983 PRESIDENT'S COMMISSION REPORT); 1 PRESIDENT'S COMMISSION FOR THE STUDY OF ETHICAL PROBLEMS IN MEDICINE AND BIOMEDICAL AND BEHAVIORAL RESEARCH, MAKING HEALTH CARE DECISIONS 171-172 (1982) (hereafter 1982 PRESIDENT'S COMMISSION REPORT).
This court has recognized as well that, above and beyond common law protections, the right to accept or forego medical treatment is of constitutional magnitude. See In re Bryant, 542 A.2d 1216, 1218 (D.C. 1988); In re Boyd, 403 A.2d 744, 748 (D.C. 1979); In re Osborne, 294 A.2d 372 (D.C. 1972). Other courts also have found a basis in the Constitution for refusing medical treatment. E.g., United States v. Charters, supra, 829 F.2d at 491 & nn. 18-19 *1245 ("[t]he right to be free of unwanted physical invasions" is constitutionally protected); Bee v. Greaves, 744 F.2d 1387, 1392-1393 (10th Cir.1984) (same), cert. denied, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985); Tune v. Walter Reed Army Medical Hospital, 602 F.Supp. 1452, 1456 (D.D. C.1985) (competent patient has right to order removal of life-sustaining medical systems); Rasmussen ex rel. Mitchell v. Fleming, 154 Ariz. 207, 215, 741 P.2d 674, 681-682 (1987) (constitutional right of privacy encompasses the right to refuse life-sustaining care); see also John F. Kennedy Memorial Hospital, Inc. v. Bludworth, 452 So.2d 921, 923-926 (Fla.1984) (incompetent persons have the right to discontinue life-sustaining care); Superintendent of Belchertown State School v. Saikewicz, 373 Mass. 728, 739, 370 N.E.2d 417, 426 (1977) (incompetent person may decline medical treatment for incurable illness); In re Conroy, supra, 98 N.J. at 336-37, 486 A.2d at 1222-1223, 1229 (competent persons have constitutional right to refuse medical treatment, and persons who become incompetent retain that right).
Decisions of the Supreme Court, while not explicitly recognizing a right to bodily integrity, seem to assume that individuals have the right, depending on the circumstances, to accept or refuse medical treatment or other bodily invasion. See, e.g., Winston v. Lee, 470 U.S. 753, 105 S.Ct. 1611, 84 L.Ed.2d 662 (1985); Schmerber v. California, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); Rochin v. California, supra note 8; cf. Union Pacific Ry. v. Botsford, 141 U.S. 250, 251, 11 S.Ct. 1000, 1001, 35 L.Ed. 734 (1891) ("No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law" (emphasis added)). In Winston v. Lee, supra, a robbery suspect challenged the state's right to compel him to submit to surgery for the removal of a bullet which was lodged in a muscle in his chest. The Court noted that the proposed surgery, which would require a general anesthetic, "would be an `extensive' intrusion on respondent's personal privacy and bodily integrity" and a "virtually total divestment of respondent's ordinary control over surgical probing beneath his skin," 470 U.S. at 764-765, 105 S.Ct. at 1619 (citation omitted), and held that, without the patient-suspect's consent, the surgery was constitutionally impermissible. Nevertheless, even in recognizing a right to refuse medical treatment or state-imposed surgery, neither Winston nor any other Supreme Court decision holds that this right of refusal is absolute. Rather, in discussing the constitutional "reasonableness of surgical intrusions beneath the skin," the Court said in Winston that the Fourth Amendment "neither forbids nor permits all such intrusions...." Id. at 760, 105 S.Ct. at 1616 (citing Schmerber v. California, supra); see also Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905) (upholding compulsory smallpox vaccinations over religious objections).[9]
This court and others, while recognizing the right to accept or reject medical treatment, have consistently held that the *1246 right is not absolute. E.g., In re Boyd, supra, 403 A.2d at 749-750; In re Osborne, supra, 294 A.2d at 374; In re President & Directors of Georgetown College, Inc., 118 U.S.App.D.C. 80, 331 F.2d 1000, cert. denied, 377 U.S. 978, 84 S.Ct. 1883, 12 L.Ed.2d 746 (1964); Rasmussen ex rel. Mitchell v. Fleming, supra, 154 Ariz. at 216, 741 P.2d at 683; In re Conroy, supra, 98 N.J. at 337, 486 A.2d at 1223; cf. Hughes v. United States, 429 A.2d 1339 (D.C.1981) (upholding as reasonable a minor surgical intrusion to remove bullets from a criminal suspect);[10]United States v. Crowder, 177 U.S.App.D.C. 165, 543 F.2d 312 (1976) (same), cert. denied, 429 U.S. 1062, 97 S.Ct. 788, 50 L.Ed.2d 779 (1977).[11] In some cases, especially those involving life-or-death situations or incompetent patients, the courts have recognized four countervailing interests that may involve the state as parens patriae: preserving life, preventing suicide, maintaining the ethical integrity of the medical profession, and protecting third parties. See, e.g., In re Boyd, supra, 403 A.2d at 748 n. 9; Brophy v. New England Sinai Hospital, Inc., 398 Mass. 417, 431-433, 497 N.E.2d 626, 634 (1986); Saikewicz, supra, 373 Mass. at 737, 370 N.E.2d at 425; In re Farrell, supra, 108 N.J. at 350, 529 A.2d at 410-411. Neither the prevention of suicide[12] nor the integrity of the medical profession[13] has any bearing on this case. Further, the state's interest in preserving life must be truly compelling to justify overriding a competent person's right to refuse medical treatment. In re Osborne, supra, 294 A.2d at 374-375; Tune v. Walter Reed Army Medical Hospital, supra, 602 F.Supp. at 1455-1456. This is equally true for incompetent patients, who have just as much right as competent patients to have their decisions made while competent respected, even in a substituted judgment framework. See In re Boyd, supra, 403 A.2d at 750; John F. Kennedy Memorial Hospital, Inc. v. Bludworth, supra, 452 So.2d at 923-924; Saikewicz, supra, 373 Mass. at 739, 370 N.E.2d at 427-428; In re Conroy, supra, 98 N.J. at 343, 486 A.2d at 1229.
In those rare cases in which a patient's right to decide her own course of treatment has been judicially overridden, courts have usually acted to vindicate the state's interest in protecting third parties, even if in fetal state. See Jefferson v. Griffin Spalding County Hospital Authority, supra (ordering that caesarean section be performed on a woman in her thirty-ninth week of pregnancy to save both the mother and the fetus); Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421, 201 A.2d 537 (ordering blood transfusions over the objection of a Jehovah's Witness, in her thirty-second week of pregnancy, to save her life and that of the fetus), cert. denied, 377 U.S. 985, 84 S.Ct. 1894, 12 L.Ed.2d 1032 (1964); In re Jamaica Hospital, 128 Misc.2d 1006, 491 N.Y. S.2d 898 (Sup.Ct.1985) (ordering the transfusion of blood to a Jehovah's Witness eighteen weeks pregnant, who objected on religious grounds, and finding that the *1247 state's interest in the not-yet-viable fetus outweighed the patient's interests); Crouse Irving Memorial Hospital, Inc. v. Paddock, 127 Misc.2d 101, 485 N.Y.S.2d 443 (Sup.Ct.1985) (ordering transfusions as necessary over religious objections to save the mother and a fetus that was to be prematurely delivered); cf. In re President & Directors of Georgetown College, Inc., supra, 118 U.S.App.D.C. at 88, 331 F.2d at 1008 (ordering a transfusion, inter alia, because of a mother's parental duty to her living minor children). But see Taft v. Taft, 388 Mass. 331, 446 N.E.2d 395 (1983) (vacating an order which required a woman in her fourth month of pregnancy to undergo a "purse-string" operation, on the ground that there were no compelling circumstances to justify overriding her religious objections and her constitutional right of privacy).
What we distill from the cases discussed in this section is that every person has the right, under the common law and the Constitution, to accept or refuse medical treatment.[14] This right of bodily integrity belongs equally to persons who are competent and persons who are not. Further, it matters not what the quality of a patient's life may be; the right of bodily integrity is not extinguished simply because someone is ill, or even at death's door. To protect that right against intrusion by others  family members, doctors, hospitals, or anyone else, however well-intentioned  we hold that a court must determine the patient's wishes by any means available, and must abide by those wishes unless there are truly extraordinary or compelling reasons to override them. In re Osborne, supra. When the patient is incompetent, or when the court is unable to determine competency, the substituted judgment procedure must be followed.
From the record before us, we simply cannot tell whether A.C. was ever competent, after being sedated, to make an informed decision one way or the other regarding the proposed caesarean section. The trial court never made any finding about A.C.'s competency to decide. Undoubtedly, during most of the proceedings below, A.C. was incompetent to make a treatment decision; that is, she was unable to give an informed consent based on her assessment of the risks and benefits of the contemplated surgery. The court knew from the evidence that A.C. was sedated and unconscious, and thus it could reasonably have found her incompetent to render an informed consent; however, it made no such finding. On the other hand, there was no clear evidence that A.C. was competent to render an informed consent after the trial court's initial order was communicated to her.
We think it is incumbent on any trial judge in a case like this, unless it is impossible to do so, to ascertain whether a patient is competent to make her own medical decisions. Whenever possible, the judge should personally attempt to speak with the patient and ascertain her wishes directly, rather than relying exclusively on hearsay evidence, even from doctors.[15]See In re Osborne, supra, 294 A.2d at 374; In re President & Directors of Georgetown College, Inc., supra, 118 U.S.App.D.C. at 87, 331 F.2d at 1007. It is improper to presume that a patient is incompetent. United States v. Charters, supra, 829 F.2d at 495. We have no reason to believe that, if competent, A.C. would or would not have refused consent to a caesarean. We hold, however, that without a competent refusal from A.C. to go forward with the surgery, and without a finding through substituted judgment that A.C. would not have consented to the surgery, it was error for the trial court to proceed to a balancing analysis, weighing the rights of A.C. against the interests of the state.
*1248 There are two additional arguments against overriding A.C.'s objections to caesarean surgery. First, as the American Public Health Association cogently states in its amicus curiae brief:
Rather than protecting the health of women and children, court-ordered caesareans erode the element of trust that permits a pregnant woman to communicate to her physician  without fear of reprisal  all information relevant to her proper diagnosis and treatment. An even more serious consequence of court-ordered intervention is that it drives women at high risk of complications during pregnancy and childbirth out of the health care system to avoid coerced treatment.[16]
Second, and even more compellingly, any judicial proceeding in a case such as this will ordinarily take place  like the one before us here  under time constraints so pressing that it is difficult or impossible for the mother to communicate adequately with counsel, or for counsel to organize an effective factual and legal presentation in defense of her liberty and privacy interests and bodily integrity. Any intrusion implicating such basic values ought not to be lightly undertaken when the mother not only is precluded from conducting pre-trial discovery (to which she would be entitled as a matter of course in any controversy over even a modest amount of money) but also is in no position to prepare meaningfully for trial. As one commentator has noted:
The procedural shortcomings rampant in these cases are not mere technical deficiencies. They undermine the authority of the decisions themselves, posing serious questions as to whether judges can, in the absence of genuine notice, adequate representation, explicit standards of proof, and right of appeal, realistically frame principled and useful legal responses to the dilemmas with which they are being confronted. Certainly courts dealing with other kinds of medical decision-making conflicts have insisted both upon much more rigorous procedural standards and upon significantly more information.
Gallagher, Prenatal Invasions and Interventions: What's Wrong with Fetal Rights, 10 HARV.WOMEN'S L.J. 9, 49 (1987).
In this case A.C.'s court-appointed attorney was unable even to meet with his client before the hearing. By the time the case was heard, A.C.'s condition did not allow her to be present, nor was it reasonably possible for the judge to hear from her directly. The factual record, moreover, was significantly flawed because A.C.'s medical records were not before the court and because Dr. Jeffrey Moscow, the physician who had been treating A.C. for many years, was not even contacted and hence did not testify.[17] Finally, the time for legal preparation was so minimal that neither the court nor counsel mentioned the doctrine of substituted judgment, which  with benefit of briefs, oral arguments, and above all, time  we now deem critical to the outcome of this case. We cannot be at all certain that the trial judge would have reached the same decision if the testimony of Dr. Moscow and the abundant legal scholarship filed in this court had been meaningfully available to him, and if there had been enough time for him to consider and reflect on these matters as a judge *1249 optimally should do.[18]

B. Substituted Judgment

In the previous section we discussed the right of an individual to accept or reject medical treatment. We concluded that if a patient is competent and has made an informed decision regarding the course of her medical treatment, that decision will control in virtually all cases. Sometimes, however, as our analysis presupposes here, a once competent patient will be unable to render an informed decision. In such a case, we hold that the court must make a substituted judgment on behalf of the patient, based on all the evidence. This means that the duty of the court, "as surrogate for the incompetent, is to determine as best it can what choice that individual, if competent, would make with respect to medical procedures." In re Boyd, supra, 403 A.2d at 750 (citation omitted).
Under the substituted judgment procedure, the court as decision-maker must "substitute itself as nearly as may be for the incompetent, and ... act upon the same motives and considerations as would have moved her...." City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 599, 65 S.Ct. 496, 498, 89 L.Ed. 483 (1945). The concept of substituted judgment, which was its roots in English law, was intended to allow courts to make dispositions from the estates of incompetents akin to those that the incompetents would have made if competent. See Strunk v. Strunk, 445 S.W.2d 145, 147-148 (Ky.1969). In recent times the procedure has been used to authorize organ "donations" by incompetents, as in Strunk, and to prohibit the forced administration of medical treatment to incompetents, over religious objections, where life itself was not at stake. E.g., In re Boyd, supra; United States v. Charters, supra. Most cases involving substituted judgment, however, have arisen in the "right to die" context, and the courts have generally concluded that giving effect to the perceived decision of the incompetent is the proper course, even though doing so will result in the incompetent's death. E.g., In re Spring, 380 Mass. 629, 405 N.E.2d 115 (1980); In re Jobes, 108 N.J. 394, 529 A.2d 434 (1987); In re Colyer, 99 Wash.2d 114, 660 P.2d 738 (1983). See generally Pollock, Life and Death Decisions: Who Makes Them and by What Standards?, 41 RUTGERS L. REV. 505 (1989); Annotation, Judicial Power to Order Discontinuance of Life-Sustaining Treatment, 48 A.L.R. 4th 67 (1986).
We have found no reported opinion applying the substituted judgment procedure to the case of an incompetent pregnant patient whose own life may be shortened by a caesarean section, and whose unborn child's chances of survival may hang on the court's decision. Despite this precedential void, we conclude that substituted judgment is the best procedure to follow in such a case because it most clearly respects the right of the patient to bodily integrity. Thus we reaffirm our holding in In re Boyd, in which we discussed how a substituted judgment should be made when a patient, although incompetent, has previously expressed objections to treatment, and we observe that many of the factors found relevant to discerning the patient's choice in Boyd are relevant here.
We begin with the proposition that the substituted judgment inquiry is primarily a subjective one: as nearly as possible, the court must ascertain what the patient would do if competent. In re Boyd, supra, 403 A.2d at 750; In re Spring, supra, 380 Mass. at 633, 405 N.E.2d at 119; Saikewicz, supra, 373 Mass. at 344, 370 N.E.2d at 431; In re Conroy, supra, 98 N.J. at 343, 486 A.2d at 1229. Due process strongly suggests (and may even require) that counsel or a guardian ad litem should be appointed for the patient unless the situation is so urgent that there is no time to do so.
Because it is the patient's decisional rights which the substituted judgment inquiry seeks to protect, courts are in accord *1250 that the greatest weight should be given to the previously expressed wishes of the patient. This includes prior statements, either written or oral, even though the treatment alternatives at hand may not have been addressed. See In re Boyd, supra, 403 A.2d at 751-752 (absolute objections to treatment are highly relevant); Brophy v. New England Sinai Hospital, Inc., supra, 398 Mass. at 427, 497 N.E.2d at 631; In re Conroy, supra, 98 N.J. at 343-45, 486 A.2d at 1229-1230; In re Dorone, 349 Pa.Super. 59, 68, 502 A.2d 1271, 1278 (1985), aff'd, 517 Pa. 3, 534 A.2d 452 (1987); see also 1982 PRESIDENT'S COMMISSION REPORT, supra, at 179. The court should also consider previous decisions of the patient concerning medical treatment, especially when there may be a discernibly consistent pattern of conduct or of thought. E.g., In re Boyd, supra, 403 A.2d at 751; In re Conroy, supra, 98 N.J. at 345, 486 A.2d at 1230; In re Dorone, supra, 349 Pa.Super. at 68, 502 A.2d at 1278; see also 1983 PRESIDENT'S COMMISSION REPORT, supra, at 133. Thus in a case such as this it would be highly relevant that A.C. had consented to intrusive and dangerous surgeries in the past, and that she chose to become pregnant and to protect her pregnancy by seeking treatment at the hospital's high-risk pregnancy clinic. It would also be relevant that she accepted a plan of treatment which contemplated caesarean intervention at the twenty-eighth week of pregnancy, even though the possibility of a caesarean during the twenty-sixth week was apparently unforeseen. On the other hand, A.C. agreed to a plan of palliative treatment which posed a greater danger to the fetus than would have been necessary if she were unconcerned about her own continuing care. Further, when A.C. was informed of the fatal nature of her illness, she was equivocal about her desire to have the baby.
Courts in substituted judgment cases have also acknowledged the importance of probing the patient's value system as an aid in discerning what the patient would choose. We agree with this approach. See In re Boyd, supra, 403 A.2d at 751 (considering the patient's adherence to religious tenets); Brophy v. New England Sinai Hospital, Inc., supra, 398 Mass. at 427, 497 N.E.2d at 631; In re Roe, 383 Mass. 415, 433, 421 N.E.2d 40, 56-59 (1981); In re Conroy, supra, 98 N.J. at 344, 486 A.2d at 1230; In re Dorone, supra, 349 Pa.Super. at 68, 502 A.2d at 1278; see also 1982 PRESIDENT'S COMMISSION REPORT, supra, at 179. Most people do not foresee what calamities may befall them; much less do they consider, or even think about, treatment alternatives in varying situations. The court in a substituted judgment case, therefore, should pay special attention to the known values and goals of the incapacitated patient, and should strive, if possible, to extrapolate from those values and goals what the patient's decision would be.
Although treating physicians may be an invaluable source of such information about a patient, the family will often be the best source. See, e.g., In re Jobes, supra, 108 N.J. at 408, 529 A.2d at 445-446. Family members or other loved ones will usually be in the best position to say what the patient would do if competent.[19] The court should be mindful, however, that while in the majority of cases family members will have the best interests of the patient in mind, sometimes family members will rely on their own judgments or predilections rather than serving as conduits for expressing the patient's wishes. This is why the court should endeavor, whenever possible, to make an in-person appraisal "of the patient's personal desires and ability for rational choice. In this way the court can always know, to the extent possible, that the judgment is that of the individual concerned and not that of those who believe, however well-intentioned, that they speak for the person whose life is in the balance." In re Osborne, supra, 294 A.2d at 374; see also John F. Kennedy Memorial Hospital, Inc. v. Bludworth, supra, 452 So.2d at 926-927 ("Disagreement among the physicians *1251 or family members or evidence of wrongful motives or malpractice may require judicial intervention").[20]
In short, to determine the subjective desires of the patient, the court must consider the totality of the evidence, focusing particularly on written or oral directions concerning treatment to family, friends, and health-care professionals. The court should also take into account the patient's past decisions regarding medical treatment, and attempt to ascertain from what is known about the patient's value system, goals, and desires what the patient would decide if competent. See In re Conroy, supra, 98 N.J. at 343-44, 486 A.2d at 1229-1230; In re Dorone, supra, 349 Pa.Super. at 68, 502 A.2d at 1278.
After considering the patient's prior statements, if any, the previous medical decisions of the patient, and the values held by the patient, the court may still be unsure what course the patient would choose. In such circumstances the court may supplement its knowledge about the patient by determining what most persons would likely do in a similar situation. In re Boyd, supra, 403 A.2d at 751, citing Saikewicz, supra, 373 Mass. at 343, 370 N.E.2d at 430; accord, 1983 PRESIDENT'S COMMISSION REPORT, supra, at 135; 1982 PRESIDENT'S COMMISSION REPORT, supra, at 180-181. When the patient is pregnant, however, she may not be concerned exclusively with her own welfare.[21] Thus it is proper for the court, in a case such as this, to weigh (along with all the other factors) the mother's prognosis, the viability of the fetus, the probable result of treatment or non-treatment for both mother and fetus, and the mother's likely interest in avoiding impairment for her child together with her own instincts for survival. Cf. In re Roe, supra, 383 Mass. at 431, 421 N.E.2d at 57.
Additionally, the court should consider the context in which prior declarations, treatment decisions, and expressions of personal values were made, including whether statements were made casually or after contemplation, or in accordance with deeply held beliefs. See In re Conroy, supra, 98 N.J. at 344, 486 A.2d at 1230; In re Dorone, supra, 349 Pa.Super. at 68, 502 A.2d at 1278; In re Colyer, supra, 99 Wash.2d at 125, 660 P.2d at 748. Finally, in making a substituted judgment, the court should become as informed about the patient's condition, prognosis, and treatment options as one would expect any patient to become before making a treatment decision. See In re Conroy, supra, 98 N.J. at 345, 486 A.2d at 1231. Obviously, the weight accorded to all of these factors will vary from case to case.

C. The Trial Court's Ruling

We reiterate that we cannot find the facts in this or any other case. That is the function of trial judges, who can view the witnesses and discern from their demeanor and testimony, rather than a cold written record, what the facts are. In this case there is an understandable paucity of factual findings, which necessarily limits our review. The trial court, faced with an issue affecting life and death, was forced to make a decision with almost no time for deliberation. Nevertheless, after reviewing the transcript of the hearing and the court's oral findings, it is clear to us that the trial court did not follow the substituted judgment procedure. On the contrary, the court's specific finding before its decision was communicated to A.C. was as follows:

*1252 The court is of the view that it does not clearly know what [A.C.'s] present views are with respect to the issue of whether or not the child should live or die. She's presently unconscious. As late as Friday of last week, she wanted the baby to live. As late as yesterday, she did not know for sure.
The court did not go on, as it should have done, to make a finding as to what A.C. would have chosen to do if she were competent. Instead, the court undertook to balance the state's and L.M.C.'s interests in surgical intervention against A.C.'s perceived interest in not having the caesarean performed.
After A.C. was informed of the court's decision, she consented to the caesarean; moments later, however, she withdrew her consent. The trial court did not then make a finding as to whether A.C. was competent to make the medical decision or whether she had made an informed decision one way or the other. Nor did the court then make a substituted judgment for A.C. Instead, the court said that it was "still not clear what her intent is" and again ordered the caesarean.
It is that order which we must now set aside. What a trial court must do in a case such as this is to determine, if possible, whether the patient is capable of making an informed decision about the course of her medical treatment. If she is, and if she makes such a decision, her wishes will control in virtually all cases. If the court finds that the patient is incapable of making an informed consent (and thus incompetent), then the court must make a substituted judgment. This means that the court must ascertain as best it can what the patient would do if faced with the particular treatment question. Again, in virtually all cases the decision of the patient, albeit discerned through the mechanism of substituted judgment, will control. We do not quite foreclose the possibility that a conflicting state interest may be so compelling that the patient's wishes must yield,[22] but we anticipate that such cases will be extremely rare and truly exceptional. This is not such a case.
Having said that, we go no further. We need not decide whether, or in what circumstances, the state's interests can ever prevail over the interests of a pregnant patient. We emphasize, nevertheless, that it would be an extraordinary case indeed in which a court might ever be justified in overriding the patient's wishes and authorizing a major surgical procedure such as a caesarean section. Throughout this opinion we have stressed that the patient's wishes, once they are ascertained, must be followed in "virtually all cases," ante at 1249, unless there are "truly extraordinary or compelling reasons to override them," ante at 1247. Indeed, some may doubt that there could ever be a situation extraordinary or compelling enough to justify a massive intrusion into a person's body, such as a caesarean section, against that person's will. Whether such a situation may someday present itself is a question that we need not strive to answer here. We see no need to reach out and decide an issue that is not presented on the record before us; this case is difficult enough as it is. We think it sufficient for now to chart the course for future cases resembling this one, and to express the hope that we shall not be presented with a case in the foreseeable future that requires us to sail off the chart into the unknown.[23]

*1253 V
Ordinarily, when the factual record in a case is insufficient to support the trial court's decision, we remand for additional findings. In this case, however, a remand for supplemental findings would be inappropriate and futile because the caesarean has been performed and cannot be undone. The record is unclear as to whether A.C. was ever competent, after being sedated, to make her own decision, and the likelihood of marshaling further evidence now on this question is doubtful at best. If the substituted judgment procedure were to be followed, there is evidence going both ways as to what decision A.C. would have made, and we see no point in requiring the court now to make that determination when it can have no practical effect on either A.C. or L.M.C.
Accordingly, we vacate the order of the trial court and remand the case for such further proceedings as may be appropriate. We note, in doing so, that the trial court's order allowing the hospital to perform the caesarean section was presumptively valid from the date it was entered until today. What the legal effect of that order may have been during its lifetime is a matter on which we express no opinion here.
Vacated and remanded.
BELSON, Associate Judge, concurring in part and dissenting in part:
I agree with much of the majority opinion, but I disagree with its ultimate ruling that the trial court's order must be set aside, and with the narrow view it takes of the state's interest in preserving life and the unborn child's interest in life.
More specifically, I agree with the guidance the opinion affords trial judges as to how to approach a case like this, first determining the mother's competency to make an informed decision whether to have a caesarean delivery and, if the mother is not competent, then making a substituted judgment for the mother. I also agree that, with respect to surgical procedures, the pregnant woman's wishes, either as stated expressly or as discerned through substituted judgment, should ordinarily be respected and carried out unless there are compelling reasons to override them.
I disagree, however, with the majority's holding, opinion at 1252, that the trial judge erred in failing to determine competency. I think it quite clear from the record that Judge Sullivan found A.C. incompetent. The court heard testimony that A.C. was "heavily sedated" and that there could be no "meaningful conversation with her at this point," and that any reduction of her medication to "permit recovery of enough cognitive function on her part" to enable the physicians to get a sense of her preference regarding therapy might have the effect of hastening her death. Given the testimony that A.C. was unable to communicate her attitude toward the proposed surgery, if she had one, I submit that the most reasonable reading of the record is that the judge found her incompetent when he stated: "The Court is of the view that it does not clearly know what [A.C.'s] present views are with respect to the issue of whether or not the child should live or die." A short time later, after hearing testimony about the sedated A.C.'s apparent reaction to the court's decision regarding surgery, the trial judge said: "The Court is still not clear what her intent is." I think the most reasonable reading of the judge's findings made under emergency circumstances remains that A.C. was found not competent either to arrive at or to communicate an informed decision about the proposed procedure. It is clear that the trial judge, at the very least, made a finding that was, under the majority's explanation of appropriate procedures, sufficient to move the inquiry forward to the substituted judgment stage.
I disagree also with the holding that the trial judge committed reversible error in failing to make a determination of substituted judgment. No party explicitly asked that he should do so, and the majority *1254 acknowledges that it could find no reported opinion applying the substituted judgment procedure to the case of an incompetent pregnant patient in A.C.'s situation. Majority opinion at 1249. Under the circumstances, the trial judge's failure to exercise substituted judgment sua sponte can hardly be deemed the sort of egregious error that must be present before a trial court can be reversed on a plain error standard. See Woodard v. City Stores Co., 334 A.2d 189, 192 (D.C.1975).
For the same reason, I disagree with the holding of the majority that Judge Sullivan erred in proceeding to a balancing analysis, weighing the rights of A.C. against those of the state and the unborn child without first having found either a competent refusal or a finding of nonconsent through substituted judgment. Majority opinion at 1247. No party argued that the court should not proceed to such a balancing analysis.[1] Because I disagree with this pivotal finding of error, I would affirm rather than reverse.
Another aspect of the majority opinion deserves comment. Having determined that the trial court must be reversed, the majority goes on to opine, in dictum, that this particular case is not one of those "extremely rare and truly exceptional" cases in which a patient's wishes regarding the proposed medical treatment can be overruled by reason of a compelling state interest (here, the interest in protecting the life of the viable unborn child). This is dictum because, as the majority points out, "[w]e have no reason to believe that, if competent, A.C. would or would not have refused consent to a caesarean."[2] Majority opinion at 1247. That being the case, and the actual application of the standard the majority adopts to the facts of this case not being necessary to the majority's determination to reverse, one must regard as dictum the majority's statement that this would not be one of those rare cases in which compelling interests might warrant overriding a mother's decision not to consent.
I think it appropriate, nevertheless, to state my disagreement with the very limited view the majority opinion takes of the circumstances in which the interests of a viable unborn child can afford such compelling reasons. The state's interest in preserving human life and the viable unborn child's interest in survival are entitled, I think, to more weight than I find them assigned by the majority when it states that "in virtually all cases the decision of the patient ... will control." Majority opinion at 1252. I would hold that in those instances, fortunately rare, in which the viable unborn child's interest in living and the state's parallel interest in protecting human life come into conflict with the mother's decision to forgo a procedure such as a caesarean section, a balancing should be struck in which the unborn child's and the state's interests are entitled to substantial weight.
It was acknowledged in Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that the state's interest in potential human life becomes compelling at the point of viability. Even before viability, the state has an "important and legitimate interest in protecting the potentiality of human life." Id. at 162, 93 S.Ct. at 731. When approximately the third trimester of pregnancy is reached (roughly the time of viability, although with advances in medical science the time of viability is being reached sooner and sooner), the state's interest becomes sufficiently compelling to justify what otherwise would be unduly burdensome state interference with the woman's constitutionally protected privacy interest. Beal v. Doe, 432 U.S. 438, 446, 97 S.Ct. 2366, 2371, 53 L.Ed.2d 464 (1977). Once that stage is reached, the state "may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation *1255 of the life or health of the mother." Roe, supra, 410 U.S. at 165, 93 S.Ct. at 732. In addressing this issue, it is important to emphasize, as does the majority opinion, that this case is not about abortion, majority opinion at 1245 n. 9;[3] we are not discussing whether a woman has the legal right to terminate her pregnancy in its early stages. Rather, we are dealing with the situation that exists when a woman has carried an unborn child to viability. When the unborn child reaches the state of viability, the child becomes a party whose interests must be considered. See King, The Juridical Status of the Fetus: A Proposal for Legal Protection of the Unborn, 77 MICH.L.REV. 1647, 1687 (1979) (viability, not birth, the determinative moment in development for purpose of determining when fetus is entitled to legal protection).
Turning to the rights of the child, tort law has long recognized the right of a living child to recover for injuries suffered when she was a viable unborn child. See Bonbrest v. Kotz, 65 F.Supp. 138 (D.D.C. 1946). In rejecting the notion that the viable unborn child is not an entity distinct from the mother, the court in Bonbrest stated:
It has, if viable, its own bodily form and members, manifests all the anatomical characteristics of individuality, possesses its own circulatory, vascular and excretory systems and is capable now of being ushered into the visible world.
Id. at 141 (footnote omitted).
Bonbrest proved to be a landmark case. In Greater Southeast Hospital v. Williams, 482 A.2d 394 (D.C.1984), this court noted that "every jurisdiction in the United States has followed Bonbrest in recognizing a cause of action for prenatal injury, at least when the injury is to a viable infant later born alive." Id. at 396. We went on to hold in Greater Southeast Hospital that a viable unborn child is a person within the coverage of the wrongful death statute, D.C.Code § 16-2701 (1981):
Inherent in our adoption of Bonbrest is the recognition that a viable fetus is an independent person with the right to be free of prenatal injury. The liability for prenatal injury recognized in Bonbrest arises at the time of the injury. If a viable fetus is a "person injured" at the time of the injury, then perforce the fetus is a "person" when he dies of those injuries, and it can make no difference in liability under the wrongful death and survival statutes whether the fetus dies of the injuries just prior to or just after birth. To hold otherwise would perpetuate the very evils the statutes were intended to prevent  that an injury would be inflicted for which no remedy existed and a tortfeasor would escape liability by inflicting injury so severe that death results.
Id. at 397.
We concluded: "In summary, having determined that a viable fetus is a person under the common law, it follows that injury to the fetus resulting in death is actionable under our wrongful death and survival statutes." Id. at 398 (emphasis added).
The holdings in Bonbrest and Greater Southeast Hospital establish that for purposes that are, at least, relevant to this case, a viable unborn child is a person at common law who has legal rights that are entitled to the protection of the courts. In a case like the one before us, the unborn child is a patient of both the hospital and any treating physician,[4] and the hospital or physician may be liable to the child for the child's prenatal injury or death if caused by *1256 their negligence. See Greater Southeast Hospital, supra; Bonbrest, supra.
Without going into the difficult question of the extent to which an unborn viable child may be entitled to protection under the Fifth, the Fourteenth, or other Amendments to the Constitution,[5] the already recognized rights and interests mentioned above are sufficient to indicate the need for a balancing process in which the rights of the viable unborn child are assigned substantial weight. This view is consistent with the decision of the only appellate court which has heretofore considered this issue. In Jefferson v. Griffin Spalding County Hosp. Auth., 247 Ga. 86, 274 S.E.2d 457 (1981), the Supreme Court of Georgia denied a stay of an order authorizing a hospital to perform a caesarean section to which the mother did not consent. Concurring, Presiding Justice Hill described the way in which the outcome was reached in the following language:
In denying the stay of the trial court's order and thereby clearing the way for immediate re-examination by sonogram and probably for surgery, we weighed the right of the mother to practice her religion and to refuse surgery on herself, against her unborn child's right to live. We found in favor of her child's right to live.
Id. 274 S.E.2d at 460.[6]
The balancing test should be applied in instances in which women become pregnant and carry an unborn child to the point of viability. This is not an unreasonable classification because, I submit, a woman who carries a child to viability is in fact a member of a unique category of persons. Her circumstances differ fundamentally from those of other potential patients for medical procedures that will aid another person, for example, a potential donor of bone marrow for transplant. This is so because she has undertaken to bear another human being, and has carried an unborn child to viability. Another unique feature of the situation we address arises from the singular nature of the dependency of the unborn child upon the mother. A woman carrying a viable unborn child is not in the same category as a relative, friend, or stranger called upon to donate bone marrow or an organ for transplant. Rather, the expectant mother has placed herself in a special class of persons who are bringing another person into existence, and upon whom that other person's life is totally dependent. Also, uniquely, the viable unborn child is literally captive within the mother's body. No other potential beneficiary of a surgical procedure on another is in that position.
For all of these reasons, a balancing becomes appropriate in those few cases where the interests we are discussing come into conflict. To so state is in no sense to fail to recognize the extremely strong interest of each individual person, including of course the expectant mother, in her bodily integrity, her privacy, and, where involved, her religious beliefs.
Thus, I cannot agree with the conclusion of the majority opinion that while we "do not quite foreclose the possibility that a *1257 conflicting state interest may be so compelling that the patient's wishes must yield... we anticipate that such cases will be extremely rare and truly exceptional." Majority opinion at 1252. While it is, fortunately, true that such cases will be rare in the sense that such conflicts between mother and viable unborn child are rare,[7] I cannot agree that in cases where a viable unborn child is in the picture, it would be extremely rare, within that universe, to require that the mother accede to the vital needs of the viable unborn child.[8]
I turn now to the impact of this decision on future cases in this jurisdiction. Despite the majority's admonition that "nothing in this opinion should be read as either approving or disapproving the holding in In re Madyun," 114 Daily Wash.L.Rptr. 2233 (D.C.Super.Ct. July 26, 1986), majority opinion at 1252-1253 n. 23, I am concerned that the majority's emphasis on the "extremely rare and truly exceptional" nature of the circumstances in which the unborn child's rights may prevail may move the law toward the extinguishment of the rights of unborn children in cases like In re Madyun. In that case, the trial court was faced with a situation in which an expectant mother refused on religious grounds to consent to a caesarean section even though she was already in labor, and sixty hours had passed since her membrane had ruptured. Although the heavy risks of infection and possible death to the fetus in the absence of a caesarean section were explained to both parents, they refused to consent to the caesarean section. Because the child could not be delivered through the birth canal, the child faced a serious and increasing danger of death or brain damage, and the mother's health was endangered as well.
After considering the facts and applicable law, the Superior Court granted the hospital's request for authorization to deliver the baby by the most expedient means  a caesarean section.[9] Counsel appointed to represent the unborn child had also joined the hospital's request. A motions division of this court denied a stay of the trial court's order. Pursuant to the trial court's order, the caesarean section was performed, and a healthy child was born and survives.[10]
I next address the sensitive question of how to balance the competing rights and interests of the viable unborn child and the state against those of the rare expectant mother who elects not to have a caesarean section necessary to save the life of her child.[11] The indisputable view that a woman carrying a viable child has an extremely strong interest in her own life, health, bodily integrity, privacy, and religious beliefs necessarily requires that her election be *1258 given correspondingly great weight in the balancing process. In a case, however, where the court in an exercise of a substituted judgment has concluded that the patient would probably opt against a caesarean section, the court should vary the weight to be given this factor in proportion to the confidence the court has in the accuracy of its conclusion. Thus, in a case where the indicia of the incompetent patient's judgment are equivocal, the court should accord this factor correspondingly less weight. The appropriate weight to be given other factors will have to be worked out by the development of law in this area, and cannot be prescribed in a single court opinion. Some considerations obviously merit special attention in the balancing process. One such consideration is any danger to the mother's life or health, physical or mental, including the relatively small but still significant danger that necessarily inheres in any caesarean delivery, and including especially any danger that exceeds that level.[12] The mother's religious beliefs as they relate to the operation would appear to deserve inclusion in the balancing process.
On the other side of the analysis, it is appropriate to look to the relative likelihood of the unborn child's survival. This could range from the situation in Madyun where the full-term child's chances for survival were apparently excellent, through a case like the one before us where the unborn child's chances for survival were from fifty to sixty percent, and on to cases where the child's chances for survival are less than even. The child's interest in being born with as little impairment as possible should also be considered.[13] This may weigh in favor of a delivery sooner rather than later. The most important factor on this side of the scale, however, is life itself, because the viable unborn child that dies because of the mother's refusal to have a caesarean delivery is deprived, entirely and irrevocably, of the life on which the child was about to embark.
Turning to the specifics of this case, and reaching them as I, unlike the majority, must because of my view that the court did not commit plain error in bypassing substituted judgment and performing a balancing test, I think this court cannot on this record hold that the trial judge abused his discretion in striking the balance he did.
Weighed in the balance against ordering the procedure were two considerations that were central to the entire proceeding: the invasive and serious nature of the proposed surgery and the fact that such surgery cannot ordinarily be performed without the consent of the patient. Under the peculiar circumstances of this case, the influence of these factors was diminished by the fact that it was not clear whether A.C. would have consented to the surgery or not. Before events began to close in on her, A.C. had agreed to a caesarean at twenty-eight weeks. Thus, she was not averse, in principle, to having that particular type of surgery. What was unresolved was whether she would consent to that surgery at twenty-six and one-half weeks, when the unborn child's chances of survival were somewhat reduced and the chances of impairment to the child somewhat enhanced. It was clear that she had intended all along to carry her unborn child until the point the child could be successfully delivered, and she persevered in that intention even when she knew she would not live long, if at all, after her child was born. Even in the tragically difficult circumstances in which A.C. found herself at the very time of the court's proceedings, she first appeared in her sedated state to agree to the procedure and then apparently to disagree. Under the circumstances, the court could deem these *1259 matters, usually most pertinent to a determination of substituted judgment, to lessen the net weight of the factors that weighed against the performance of the surgery.[14] Also to be considered in the balance was the rather minimal, but nevertheless undisputable, additional risk that caesarean delivery presented for the mother.[15]
Turning to the interest of the unborn child in living and the parallel interest of the state in protecting that life, the evidence indicated that the child had a fifty to sixty percent chance of survival and a less than twenty percent chance of entering life with a serious handicap such as cerebral palsy or mental retardation. The evidence also showed that a delay in delivering the child would have increased the likelihood of a handicap. In view of the record before Judge Sullivan, and on the basis that there had been no plain error in not applying the sort of substituted judgment analysis that we for the first time mandate in today's ruling, I think it cannot be said that he abused his discretion in the way he struck the balance between the considerations that favored the procedure and those that went against it.[16]
For the reasons stated above, I would affirm.

APPENDIX

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA CIVIL DIVISION

IN RE MADYUN

Misc. No. 189-86
Diane Weinroth for parents.
Martin R. Baach for fetus.
Richard S. Love, Assistant Corporation Counsel, for the District of Columbia.
LEVIE, Associate Judge:
Upon the oral petition of D.C. General Hospital ("Hospital") for an order that the Hospital be authorized to perform a Caesarean section upon Ayesha Madyun to deliver her fetus, a hearing was convened at the Hospital at 10:30 p.m. on July 25, 1986. Diane Weinroth, Esq., accepted appointment by the Court to represent the parents, Yahya and Ayesha Madyun; Martin R. Baach, Esq., accepted appointment by the Court to be guardian ad litem for the fetus; and Assistant Corporation Counsel Richard S. Love represented the Hospital. *1260 Testimony was taken from Dr. John Cummings, Chief Resident on the Georgetown University Obstetrical/Gynecological service, as well as from Mr. and Mrs. Madyun. After hearing testimony and arguments of counsel, the Court orally granted the Hospital's petition at 1:05 a.m., on July 26 and then denied the parents' motion for a stay.[1] A telephonic appeal was heard and the decision of this Court was affirmed (Pryor, C.J. and Terry, J.).[2]

FINDINGS OF FACT
The mother of the infant, Ayesha Madyun, is a 19-year-old woman experiencing her first pregnancy. She arrived at the Hospital on July 25, 1986, at approximately 1:45 a.m., after previously having been to Greater Southeast Community Hospital for an unknown period of time. Upon admission to the Hospital, it was determined that she was at term; she related that her membrane had ruptured (water broken) some 48 hours earlier.[3] Mrs. Madyun indicated throughout the entire time prior to the performance of the Caesarean section that she wanted a natural delivery. By 11:00 a.m. on July 25 she was seven centimeters dilated. When the hearing convened at the Hospital almost 12 hours later, Mrs. Madyun was still dilated at seven centimeters. By the time of the hearing her contractions were coming at intervals approximately five minutes apart.[4]
Mr. and Mrs. Madyun met with the medical staff at approximately 4:00 p.m. and again at 8:00 p.m. on July 25 to discuss the available options. When no progress toward completing a natural (vaginal) delivery was evidenced by 8:00 p.m., it was recommended that Mrs. Madyun consent to undergo Caesarean section to deliver the fetus. Consent to perform a Caesarean section was denied. When questioned during the hearing, some four hours after the 8:00 p.m. conference, Mrs. Madyun reiterated her preference for a natural delivery and expressed her belief that a Caesarean section was not necessary. She understood the risks of infection to the fetus resulting from continuation of labor without delivery, but sought to explain her decision to decline a Caesarean section by reference to her religious beliefs. Mrs. Madyun testified that a Muslim woman has the right to decide whether or not to risk her own health to eliminate a possible risk to the life of her undelivered fetus.[5]
During a separate, longer interview, Mr. Madyun explained that his refusal to consent to the performance of a Caesarean was based upon his belief that there was no demonstrable danger at that point to either Mrs. Madyun or the fetus.[6] For example, Mr. Madyun stated that there were no signs of the onset of sepsis except a slightly elevated temperature. Further, it was his belief that there had been insufficient opportunity for his wife to deliver vaginally. He also expressed his view that the Hospital had failed to permit Mrs. Madyun to engage in certain potentially natural acts of assisting delivery, such as standing up or walking around. Mr. Madyun similarly explained that a Muslim woman, confronted with a life or death situation, had the right to decide whether to risk her health or life to save an unborn fetus. The risks of infection and possible death to the fetus in the absence of a Caesarean section were likewise explained to and understood by Mr. Madyun.
*1261 The medical basis for the Hospital's emergency oral petition was presented through the testimony of Dr. Cummings. After receiving his M.D. degree at the George Washington University, Dr. Cummings took a two-year general surgery program at Emory University. This was followed by a four-year period as a physician in the U.S. Navy Medical Corps. He is now in the final year of a four-year obstetrical/gynecological program at Georgetown, and is Chief Resident of the Georgetown Service at the Hospital.
According to Dr. Cummings, normal labor for an uncomplicated first pregnancy is 10-15 hours. For a woman in her first pregnancy to remain dilated at seven centimeters for 12 hours was, in his opinion, abnormal.[7] Normal obstetrical procedures with a term pregnancy call for delivery of a baby within 24 hours of the membrane's rupture.
Failure to adhere to this procedure increases the risk of chorioamnionitis (inflammation of the fetal placental membranes) which can lead to fetal sepsis (infection). This, in turn, can result in the death of the baby or brain damage. Sepsis can start at any time 24 hours after rupture of the membrane. The likelihood of infection to the baby (fetus) increases greatly in proportion to the length of time between rupture of the membrane and delivery of the baby. It was the opinion of Dr. Cummings that each passing hour increased the risk of fetal sepsis.
As Dr. Cummings explained, one of the most insidious dangers in the situation presented by Mrs. Madyun was that sepsis could begin without detection and advance to the point of causing the death of the baby with little, or possibly no, warning. Prior to birth, it is difficult to determine the commencement of fetal sepsis. While there are certain symptoms of fetal sepsis (maternal temperature, foul smelling discharge, and fetal heartbeat), evidence of them may not become apparent until the baby is already septic.[8] Given the fact that, by the time of hearing, Mrs. Madyun's membrane had ruptured between 60 and 70 hours earlier, Dr. Cummings believed that the risk of fetal sepsis here was 50-75%.[9] In contrast, the risk to Mrs. Madyun undergoing a Caesarean section was said to be 0.25%.
Against this background, the Hospital was seeking authorization to deliver the baby by the most expedient means  a Caesarean section.[10] On behalf of the unborn child, Mr. Baach joined in the Hospital's request that authorization for the Caesarean section be granted.

CONCLUSIONS OF LAW
When a competent adult declines medical treatment on religious grounds, the Court is obligated to respect this decision, even in a life or death situation, unless the state can "demonstrate a compelling interest that would justify overriding the individual's choice." In re Lucille Boyd, 403 A.2d 744, 748 (D.C.1979); In re Osborne, 294 A.2d 372, 374 (D.C.1972); Canterbury v. Spence, 150 U.S. App.D.C. 263, 271, 464 F.2d 772, 780, cert. denied, 409 U.S. 1064, [93 S.Ct. 560, 34 L.Ed.2d 518] (1972); In the Matter of B.B.H., 111 Wash.L.Rep. 1929, 1934 (D.C.Super.Ct., Oct. 6, 1983) (Schwelb, J.); In the Matter of Bentley, 102 Wash.L.Rep. 1221, 1225 (D.C.Super.Ct., June 17, 1974) (Burka, J.); John F. Kennedy Memorial Hospital v. Heston, 58 N.J. 576, 279 A.2d 670, 674 (1971); cf. Application of the President and Directors of *1262 Georgetown College, Inc., 118 U.S.App. D.C. 80, 331 F.2d 1000 (1964).
In the case of children, the state acting as parens patriae has the ability, in appropriate situations, to "restrict" a parent's control of a child, even where the parent's claim to control is founded upon religious rights or a more generalized "right[ ] of parenthood...." Prince v. Massachusetts, 321 U.S. 158, 166 [64 S.Ct. 438, 442, 88 L.Ed. 645] (1944). Thus, where the requisite factual predicate has been established, courts have ordered medical treatment of children over parental objections. See e.g., In the Matter of B.B.H., 111 Wash.L.Rep.1929 (Four hour old infant); In the Matter of Adam L., 111 Wash.L. Rep. 25 (D.C.Super.Ct., Jan. 6, 1983) (Schwelb, J.) (2 year old); Custody of a Minor, 375 Mass. 733, 379 N.E.2d 1053 (1978) (26 month old infant); In the Matter of Kevin Sampson, 37 A.D.2d 668, 323 N.Y.S.2d 253 (1971) (16 year old). With both children and adults, therefore, the question of the state's "compelling interest" is a crucial factor to be determined.
Counsel for the parents, while not challenging these general propositions of law, questioned whether consideration of the state's interest affecting a child already born applies with the same force to an unborn child. Under the facts here, the answer is yes.
The state has an "important and legitimate interest in protecting the potentiality of human life." Roe v. Wade, 410 U.S. 113, 162 [93 S.Ct. 705, 731, 35 L.Ed.2d 147] (1973). At the point of "viability"[11] the state's interest becomes "`compelling"' id. at 163. To be sure, by the third trimester the state's intent "become[s] sufficiently compelling to justify unduly burdensome state interference with the woman's constitutionally protected privacy interest." Beal v. Doe, 432 U.S. 438, 446 [97 S.Ct. 2366, 2371, 53 L.Ed.2d 464] (1977). A "compelling interest" of the state may likewise justify overriding religious convictions in cases of unborn infants. In re Osborne, 294 A.2d at 374; Jefferson v. Griffin Spalding County Hospital Authority, 247 Ga. 86, 274 S.E.2d 457 (1981) (per curiam) (unborn infant); Raleigh Fitkin-Paul Morgan Memorial Hospital v. Anderson, 42 N.J. 421, 201 A.2d 537 (per curiam), cert. denied, 377 U.S. 985 [84 S.Ct. 1894, 12 L.Ed.2d 1032] (1964) (unborn infant); In the Matter of Application of Jamaica Hospital, 128 Misc.2d 1006, 491 N.Y.S.2d 898 (Sup.Ct.1985) (unborn infant).
Because Mrs. Madyun was at term, there was no issue as to viability. All that stood between the Madyun fetus and its independent existence, separate from its mother, was, put simply, a doctor's scalpel. In these circumstances, the life of the infant inside its mother's womb was entitled to be protected. See e.g., Jefferson v. Griffin Spalding, 274 S.E.2d at 460; Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 201 A.2d at 538; In re Appl. of Jamaica Hosp., 491 N.Y.S.2d at 989-900.
In Jefferson v. Griffin Spalding County Hosp. Auth., 247 Ga. 86, 274 S.E.2d 457 (1981) the Georgia Supreme Court denied a request for a stay of an order of the Superior Court that a mother submit to a Caesarean section. There, the mother who was at term had a condition which made it "a 95% certainty that the child cannot survive natural childbirth (vaginal delivery)." Id. [274 S.E.2d] at 458. Indeed, the mother's chances of surviving a vaginal delivery were only 50%. Id. Asserting religious beliefs, the mother refused to submit to the C-section or to any blood transfusion. Id. The trial court, however, found "`that the state has an interest in the life of this unborn, living human being. The Court finds that the intrusion into the life of [the parents] is outweighed by the duty of the state to protect a living, unborn human being from meeting his or her death before being given the opportunity to live.'" Id. at 460. The Georgia Supreme Court denied the parents' request for a stay. Id.[12]
*1263 In the instant case, the Court was confronted with a 50-75% risk of infection for the infant, in view of the extended period of time (60 hours) since rupture of the mother's membrane. The testimony adduced at the hearing was that the onset of infection to the infant could begin and progress to a potentially fatal point before symptoms of the infection became evident. To have required the doctors to continue a "wait and see" attitude could have had potentially fatal consequences to the infant. It is one thing for an adult to gamble with nature regarding his or her own life; it is quite another when the gamble involves the life or death of an unborn infant.
The Court had before it parents who, in part, refused a Caesarean section on the basis of religious beliefs. Although both parents impressed the Court as sincere, it was evident that the stronger basis for their individual decisions was the belief that the surgical procedure was not necessary and that additional steps could be taken to enhance the possibility of a vaginal delivery. Neither parent, however, is a trained physician. To ignore the undisputed opinion of a skilled and trained physician to indulge the desires of the parents where, as here, there is a substantial risk to the unborn infant, is something the Court cannot do.[13] Indeed, even if the religious beliefs of the parents were the primary or sole reason for refusing a Caesarean, the state had a compelling interest in ensuring this infant could be born. See Jefferson v. Griffin Spalding, 274 S.E.2d at 460. "Parents may be free to become martyrs themselves. But it does not follow they are free, in identical circumstances, to make martyrs of their children before they have reached the age of full and legal discretion when they can make that choice for themselves." Prince v. Massachusetts, 321 U.S. at 170 [64 S.Ct. at 444]. On these facts, the parents may not make a martyr of their unborn infant.
Accordingly, the Hospital is ordered to take such steps as medically indicated, including but not limited to a C-section, to preserve and protect the birth and safety of the fetus.

Interim Findings and Conclusions
Upon petition of D.C. General Hospital for an order that the Hospital be authorized to perform a Caesarean section upon Ayesha Madyun (mother) to deliver her fetus and having heard from Mr. and Mrs. Madyun, counsel for the Hospital, the parents, the guardian ad litem and Dr. Cummings:
The Court finds that Mrs. Madyun's membrane ruptured at noon on July 23, 1986 and has been so far more than 60 hours; for almost 12 hours she has remained dilated at 7 cm.; that Dr. Cummings has given his medical opinion the fetus is at risk of fetal sepsis (infection) if a C-section is not performed at once [and that], the risk of sepsis increases. By contrast the risk to the mother of a C-section is at .25%. The basis for the parents' objection is a religious belief that, as Muslims, it is the choice of the mother to decide between her health and body and that of the fetus. Dr. Cummings said that normal medical practice calls for delivery of a baby within 24 hours of the rupture of the membrane. *1264 There is no way to determine whether sepsis has or will begin and it can begin and progress to such a stage that death could be imminent. Mrs. Madyun's labor pattern is aberrant according to Dr. Cummings. He also said the likelihood of infection is proportional to the time since the time of rupture and that sepsis can start any time after rupture. The risk of sepsis is between 50-75% under these conditions. No alternative medical procedures are available at this time; under the present circumstances, according to Dr. Cummings, sepsis can be fatal or lead to brain damage. Moreover, Dr. Cummings testified that there may be no signs of sepsis before it progresses to the point of causing death.
Given the significant risks to the fetus versus the minimal risks to the mother, the Court concludes that there is a compelling interest to intervene and protect the life and safety of the fetus.
Accordingly, the Hospital is ordered to take such steps as are medically indicated, including but not limited to a C-section, to preserve and protect the birth and safety of the fetus.
The findings and conclusions are prepared for expeditiously facilitating a decision under the circumstances. The Court reserves the right to supplement these based upon the record and tape recordings. The parties can submit pleadings if they desire.
 1:05 a.m. 7/26/86
 Richard A. Levie
 Associate Judge
Affirmed per Judges Pryor and Terry 2:08 a.m. 7/26/86
NOTES
[*] Judge Rogers was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on November 1, 1988.
[**] Judge Mack was an Associate Judge of the court at the time of argument. She was commissioned as a Senior Judge on December 1, 1989.
[1] Strictly speaking, this is not a rehearing but an initial hearing en banc. The motions division heard only the application for a stay, which it denied and which is now moot. The en banc court, however, has before it the entire appeal on the merits, which no division of the court has ever considered.
[2] We observe nevertheless that it would be far better if judges were not called to patients' bedsides and required to make quick decisions on issues of life and death. Because judgment in such a case involves complex medical and ethical issues as well as the application of legal principles, we would urge the establishment  through legislation or otherwise  of another tribunal to make these decisions, with limited opportunity for judicial review. See Satz v. Perlmutter, 379 So.2d 359, 360 (Fla.1980); In re Conroy, 98 N.J. 321, 335, 486 A.2d 1209, 1221 (1985); In re Hamlin, 102 Wash.2d 810, 817, 689 P.2d 1372, 1378-1379 (1984).

We also emphasize that our decision today is the result of considerable deliberation and that we have enjoyed two luxuries unavailable to the trial court: ample time to decide the case, and extensive briefs and oral argument from the parties and several amici. The trial judge had no such advantage. He was called in during the worst of emergencies, with little time for reflection, to make a decision which under the best of circumstances is extraordinarily difficult. Although we conclude that his decision must be set aside, we nevertheless commend him for the painstaking and conscientious manner in which he performed the task before him.
[3] Dr. Edwards was testifying as an expert, but not as a treating physician. Up to that point she had had "no direct involvement" with either A.C. or her family, but she did hear the testimony of the treating physicians who were familiar with A.C.'s condition.
[4] A.C.'s husband was too distraught to testify and uttered only a few words at the hearing.
[5] Madyun was affirmed by this court in an unreported order. See also note 23, infra.
[6] We do not revisit in this appeal the issue of whether this court is bound by the case-or-controversy strictures of Article III of the Constitution. See Lee v. District of Columbia Board of Appeals & Review, 423 A.2d 210, 216-217 n. 13 (D.C.1980); Kopff v. District of Columbia Alcoholic Beverage Control Board, 381 A.2d 1372, 1377-1378 & n. 11 (D.C.1977); D.C.Code § 11-705(b) (1989).
[7] Because the patient in Jefferson had a placenta previa which blocked the birth canal, doctors estimated that without caesarean intervention there was a ninety-nine percent chance that her full-term fetus would perish and a fifty percent chance that the mother would die as well. The mother was unquestionably competent to make her own treatment decisions, but refused a caesarean because of her religious beliefs. A trial court gave custody of the fetus to state human resources officials and ordered a caesarean section; the Georgia Supreme Court denied the parents' motion for a stay.
[8] There are also practical consequences to consider. What if A.C. had refused to comply with a court order that she submit to a caesarean? Under the circumstances, she obviously could not have been held in civil contempt and imprisoned or required to pay a daily fine until compliance. Cf. United States v. United Mine Workers, 330 U.S. 258, 304-306, 67 S.Ct. 677, 701-02, 91 L.Ed. 884 (1947); D.D. v. M.T., 550 A.2d 37, 43 (D.C.1988). Enforcement could be accomplished only through physical force or its equivalent. A.C. would have to be fastened with restraints to the operating table, or perhaps involuntarily rendered unconscious by forcibly injecting her with an anesthetic, and then subjected to unwanted major surgery. Such actions would surely give one pause in a civilized society, especially when A.C. had done no wrong. Cf. Rochin v. California, 342 U.S. 165, 169, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).
[9] We think it appropriate here to reiterate and emphasize a point that the motions division made in its opinion: "that this case is not about abortion." In re A.C., supra, 533 A.2d at 614. Supreme Court decisions on abortion, beginning with Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), have been read as recognizing "a fundamental individual right to decide whether or not to beget or bear a child." Bowers v. Hardwick, 478 U.S. 186, 190, 106 S.Ct. 2841, 2844, 92 L.Ed.2d 140 (1986) (citation omitted). That decisional right is not at issue here, for the record makes clear that A.C. sought to become pregnant, that she wanted to bear her child as close to term as possible, and that neither she nor anyone associated with her at any time sought to terminate her pregnancy. The issue presented in this case is not whether A.C. (or any woman) should have a child but, rather, who should decide how that child should be delivered. That decision involves the right of A.C. (or any woman) to accept or forego medical treatment. The Supreme Court has not yet focused on this question in the context of a pregnancy, and we are not so adept at reading tea leaves as to predict how it might rule. But see Robertson, Procreative Liberty, supra, 69 VA. L.REV. at 451-452 (attempting such a prediction).
[10] In the present case we are dealing with a caesarean section, which is plainly a major surgical procedure. Our discussion of the circumstances, if any, in which the patient's wishes may be overridden presupposes a major bodily invasion. We express no opinion with regard to the circumstances, if any, in which lesser invasions might be permitted, or where the line should be drawn between "major" and "minor" surgery.
[11] Both Hughes and Crowder antedate the Supreme Court decision in Winston v. Lee, supra. We need not decide here whether Winston would require a different result if Hughes or Crowder were to arise today.
[12] Courts have uniformly drawn a distinction between affirmatively acting to commit suicide and merely allowing one's body to follow its natural course without treatment. E.g., In re Conroy, supra, 98 N.J. at 337, 486 A.2d at 1224; Saikewicz, supra, 373 Mass. at 738 n. 11, 370 N.E.2d at 426 n. 11.
[13] In this case no physician was ordered to perform surgery or to provide any treatment against his or her will. Further, the current ethical position of the medical community is that a physician treating a pregnant woman in effect has two patients, the mother and the fetus, and should assess the risks and benefits attendant to each in advising the mother on the course of her treatment. American College of Obstetricians and Gynecologists (ACOG) Ethics Committee Opinion No. 55; Patient Choice: Maternal-Fetal Conflict (October 1987).
[14] We are not faced here with any legislative enactment in the area, and thus we have no occasion to rule in any respect on constitutional considerations, if any, that might affect statutory treatment of the various interests at issue.
[15] We recognize, of course, that this will not always be feasible. Our expression of a preference for personal observation by a trial judge "whenever possible" should not be construed as a criticism of the trial judge in this case for failing to move the hearing to A.C.'s bedside.
[16] In at least one case, a woman whose objection to a caesarean delivery had been overridden by a court went into hiding and gave birth to her child vaginally. See Rhoden, supra, 74 CAL.L.REV. at 1959-1960. In another case, "a 16-year-old pregnant girl in Wisconsin has been held in secure detention for the sake of her fetus because she tended to be on the run and to lack motivation or ability to seek prenatal care." Obstetrical Interventions, supra, 316 NEW ENG. J. MED. at 1195.
[17] In an affidavit filed after the hearing, Dr. Moscow said that if he had been notified of the proceedings, he would have come to the hospital immediately and would have testified that a caesarean section was medically inadvisable both for A.C. and for the fetus. Dr. Moscow also viewed the hospital's handling of A.C.'s case as deficient in several other significant respects. In these circumstances we think it unfortunate that Dr. Moscow was not called by representatives of the hospital and made available to the court when the hospital decided to seek judicial guidance.
[18] Although we appreciate the force of Judge Belson's plain error analysis, to which we would ordinarily be sympathetic, we think it somewhat harsh to preclude a party from making additional arguments on appeal in a case such as this, in which there was virtually no time to prepare for the hearing below.
[19] Nevertheless, when a court is called upon to make a decision or to sanction one, it is frequently because there is a conflict as to treatment choice among family members, physicians, or both. Were family members and physicians in complete agreement, it is unlikely that a court would be brought into the discussion.
[20] The family's primacy in aiding the court as surrogate decision-maker may be subject to challenge for a variety of reasons. For example, grieving family members may themselves be unable to make or communicate an informed decision. There may also be conflicting interests, or family members may be inclined for their own reasons to disregard what the patient herself would want. See 1982 PRESIDENT'S COMMISSION REPORT. supra, at 183. On the other hand, we think it proper for the court to conclude that the patient might consider the needs of her family in making a treatment decision. See In re Roe, supra, 383 Mass. at 432, 421 N.E.2d at 58.
[21] According to the ACOG Ethics Committee Opinion, supra note 13, "[t]he welfare of the fetus is of the utmost importance to the majority of women; thus only rarely will a conflict arise."
[22] Absolutes like "never" should generally be avoided because "the future may bring scenarios which prudence counsels our not resolving anticipatorily." Florida Star v. B.J.F., ___ U.S. ___, 109 S.Ct. 2603, 2608, 105 L.Ed.2d 443 (1989).
[23] In particular, we stress that nothing in this opinion should be read as either approving or disapproving the holding in In re Madyun, supra. There are substantial factual differences between Madyun and the present case. In this case, for instance, the medical interests of the mother and the fetus were in sharp conflict; what was good for one would have been harmful to the other. In Madyun, however, there was no real conflict between the interests of mother and fetus; on the contrary, there was strong evidence that the proposed caesarean would be beneficial to both. Moreover, in Madyun the pregnancy was at full term, and Mrs. Madyun had been in labor for two and a half days; in this case, however, A.C. was barely two-thirds of the way through her pregnancy, and there were no signs of labor. If another Madyun-type case ever comes before this court, its result may well depend on facts that we cannot now foresee. For that reason (among others), we defer until another day any discussion of whether Madyun was rightly or wrongly decided.
[1] In the telephone hearing before a division of this court that followed immediately after the trial judge's ruling, counsel for the mother acknowledged that balancing was appropriate.
[2] In view of this statement, I find puzzling the majority's discussion at p. 1248, et seq., of "two additional arguments against overriding A.C.'s objections to caesarean surgery." No such objections were found to exist.
[3] The majority opinion, however, oversimplifies matters when it states, p. 1245 n. 9: "[T]he issue presented in this case is not whether A.C. (or any woman) should have a child but, rather, who should decide how that child should be delivered." The cruel realities of the situation made the issue far more difficult. It could better be stated as whether the unborn child should face a greatly reduced chance of survival upon post mortem delivery occasioned by a decision to forgo a caesarean procedure or whether, instead, the child should be afforded a probability of living as a result of a surgical procedure that involved both some risk to A.C. and an invasion of her bodily integrity.
[4] J. Pritchard, P. MacDonald, & N. Gant, Williams Obstetrics 267 (17th ed. 1985).
[5] I recognize that the Supreme Court has held that the word "person," as used in the Fourteenth Amendment, does not include the unborn. Roe v. Wade, supra, 410 U.S. at 158, 93 S.Ct. at 729. Nevertheless, this is a matter in which the policy of the law may evolve, and in the elastic frames of due process and equal protection analysis under the Fourteenth and Fifth Amendments, it may eventually be determined that viable unborn children are persons entitled, constitutionally, to protection of their liberty, their property, and their very lives, even though they may not be considered persons for some other purposes under the Constitution. Ultimately, the question of whether a viable unborn child is considered a person under the Fifth and Fourteenth or other Amendments to the Constitution for purposes of the right to survive is one of policy for the courts.

As one commentator has pointed out, however, the right of the viable unborn child to legal protection does not depend upon such classification as a person. King, supra, 77 MICH. L.REV. at 1687.
[6] The majority opinion states that "Jefferson is of limited relevance, if any at all, to the present case." Majority opinion at 1243. I disagree. The Georgia courts balanced the interest of the unborn child in living against a competent mother's refusal to undergo a caesarean section, and ruled in favor of the child. That some of the circumstances were different from those in the case before us does not alter this most salient feature of the case.
[7] The majority opinion at 1251 n. 21 quotes Opinion No. 55 of the Ethics Committee of the American College of Obstetricians and Gynecologists as follows: "[t]he welfare of the fetus is of the utmost importance to the majority of women; thus only rarely will a conflict arise." Another observer described the attitude of most expectant mothers more graphically: "The vast majority of women will accept significant risk, pain, and inconvenience to give their babies the best chance possible. One obstetrician who performs innovative fetal surgery stated that most of the women he sees `would cut off their heads to save their babies.'" Rhoden, The Judge in the Delivery Room: The Emergence of Court-Ordered Cesareans, 74 CALIF.L.REV. 1951, 1959 (1986).
[8] To the contrary, it appears that a majority of courts faced with this issue have found that the state's compelling interest in protection of the unborn child should prevail. See Noble-Allgire, Court-Ordered Cesarean Sections, 10 J. LEGAL MED. 211, 236 (1989). I add that in mapping this uncharted area of the law, we can draw lines, and a line I would draw would be to preclude the use of physical force to perform an operation. The force of the court order itself as well as the use of the contempt power would, I think, be adequate in most cases. See id. at 243.
[9] The opinion of Superior Court Judge Richard A. Levie in Madyun is attached as an appendix to this opinion.
[10] The Washington Post, Dec. 13, 1988, at D1.
[11] For a thoughtful proposal for judicial standards in this area, see Noble-Allgire, supra, 10 J. LEGAL. MED. at 244-48. And for a considered proposal for the standards to be used where the wishes of the mother conflict with the interests of her unborn child in the related area of medical treatment of the fetus, see Comment, The Fetal Patient and the Unwilling Mother: A Standard for Judicial Intervention, 14 PAC.L.J. 1065, 1093 (1983).
[12] In Thornburgh v. American College of Obstetricians & Gynecologists, 476 U.S. 747, 106 S.Ct. 2169, 90 L.Ed.2d 779 (1986), a case involving abortion, the Supreme Court repeated its view that any trade-off between the woman's health and additional chances of fetal survival was undesirable. Id. at 769, 106 S.Ct. at 2183. Whether this applies to caesarean cases is unclear. See Noble-Allgire, supra, 10 J.LEGAL. MED. at 239.
[13] Although avoiding impairment is a legitimate concern, it would be inappropriate for a court to weigh against the unborn child the possibility that it would be "handicapped" or "flawed" at birth because such persons can have lives and can enrich the lives of others.
[14] An additional factor, which is difficult to assess but probably deserves some consideration, is that caesarean deliveries are quite common. According to the Bureau of the Census, the Department of Commerce, 24.1 per cent of all births were by caesarean section in the year 1986, the latest year for which it furnished statistics. STATISTICAL ABSTRACT OF THE UNITED STATES 65 (109th ed. 1989). Without detracting from the seriousness of the caesarean procedure, its invasiveness, and the somewhat greater risk it entails, it seems reasonable to consider the fact that nearly a quarter of all births are caesarean not only in the substituted judgment analysis but also in the balancing analysis that should resolve a conflict between mother and unborn child.
[15] I note that there was no evidence in this case that the caesarean procedure was likely to shorten A.C.'s life. Although the trial judge alluded in his findings to testimony to that effect, he was apparently referring to argument of counsel rather than testimony. After the judge's findings were made, the record was reopened to receive information from Dr. Hamner who had just spoken to A.C. In reporting that she seemed more lucid and had three times answered that she assented to a caesarean delivery, he said he had asked her if she realized that she "may not survive the surgical procedure." Because Dr. Hamner had already testified that in his opinion A.C. had less than twenty-four hours to live, and because he presumably was concerned with obtaining the consent of a patient informed of even those risks that were less than probable, this cannot be deemed the statement of an opinion that the surgery would probably shorten A.C.'s life.
[16] The majority states that "a remand for supplemental findings would be inappropriate and futile because the caesarean has been performed and cannot be undone" and remands for "such further proceedings as may be appropriate." Majority opinion at 1253. Yet one of the two grounds the majority assigns for nonmootness is that "resolution of the legal issues might affect a separate action, actual or prospective, between the parties." Majority opinion at 1241-1242. The trial judge who heard the testimony is still available, and a transcript of the testimony has been prepared. The evidence would support either a finding that A.C.'s substituted judgment would be to undergo the surgery or a finding to the contrary. Because we have held the case not moot, I would remand for findings on that issue.
[1] Although the Court prepared interim findings of fact and conclusions of law on July 26, 1986, this Memorandum Opinion and Order is a more detailed explication of the basis for the Court's decision in accordance with the testimony adduced at the hearing.
[2] The interim Findings and Conclusions of the Court were read to the Court of Appeals and are attached hereto.
[3] Mrs. Madyun testified that her membrane had ruptured at noon on July 23, 1986.
[4] While use of an internal fetal monitor was not permitted by Mr. and Mrs. Madyun, an external monitor was attached.
[5] Once delivered, neither Mr. nor Mrs. Madyun seemed to object to employment of medication to treat any infection of the baby.
[6] At no time did the Court or counsel question the legal competence of either parent.
[7] None of counsel present at the hearing questioned the competence or expertise of Dr. Cummings. Based upon Dr. Cummings' education and experience, the Court was satisfied with respect to the doctor's expertise and competence.
[8] The only symptom present here was a slightly elevated maternal temperature.
[9] Excluding any examinations at Greater Southeast, Mrs. Madyun had experienced ten vaginal exams since admission to the Hospital. The number of examinations also increases the risk of introducing infection into the body.
[10] Realizing that normal obstetrical criteria calls for delivery within 24 hours of rupture, and the unchanged degree of dilation for almost 12 hours, Dr. Cummings believed that protrusion (a labor inducer) was not appropriate.
[11] Viability is when the fetus "is, potentially able to live outside the mother's womb, albeit with artificial aid...." (footnote omitted). Roe v. Wade, 410 U.S. at 160 [93 S.Ct. at 730].
[12] See also, Raleigh Fitkin-Paul Morgan Mem. Hosp. v. Anderson, 201 A.2d 537 (blood transfusion necessary to save life of mother and unborn infant (32 wks.) ordered over religious objections); Application of Jamaica Hosp., 491 N.Y.S.2d 898 (blood transfusion ordered over religious objections to stabilize condition of mother and save unborn child that was not yet viable).
[13] A case such as this puts the Hospital and its staff in an awkward position.

Hospitals exist to aid the sick and the injured. The medical and nursing professions are consecrated to preserving life. That is their professional creed. To them, a failure to use a simple, established procedure in the circumstances of this case would be malpractice, however the law may characterize that failure because of the patient's private convictions. A surgeon should not be asked to operate under the strain of knowing that a transfusion may not be administered even though medically required to save his patient. The hospital and its staff should not be required to decide whether the patient is or continues to be competent to make a judgment upon the subject, or whether the release tendered by the patient or a member of his family will protect them from civil responsibility.
John F. Kennedy Mem. Hosp. v. Heston, 279 A.2d at 673.