*In re* BABY BOY DOE, a Fetus (The People of the State of Illinois, Plaintiff-Appellant, v. Mother Doe, Defendant-Appellee).

First District (2nd Division)    No. 1—93—4322

Opinion filed April 5, 1994.

Renee Goldfarb and Jeanne Bischoff, Assistant State's Attorneys, and Patrick T. Murphy, Public Guardian, all of Chicago, for appellant.

Rita A. Fry, Public Defender (Xavier Velasco and Henry Hams, Assistant Public Defenders, of counsel), and Colleen K. Connell and Susan Wishnick, both of The Roger Baldwin Foundation of ACLU, Inc., both of Chicago, for appellee.

PRESIDING JUSTICE DiVITO delivered the opinion of the court:
This case asks whether an Illinois court can balance whatever rights a fetus may have against the rights of a competent woman to

refuse medical advice to obtain a cesarean section for the supposed benefit of her fetus. Following the lead of the Illinois Supreme Court in *Stallman v. Youngquist* (1988), 125 Ill. 2d 267, 531 N.E.2d 355, we hold that no such balancing should be employed, and that a woman's competent choice to refuse medical treatment as invasive as a cesarean section during pregnancy must be honored, even in circumstances where the choice may be harmful to her fetus.

Both the factual background and the procedural posture of the case are important. "Doe" is a married woman who was expecting her first child. She sought and had been receiving regular prenatal care throughout her pregnancy at St. Joseph's Hospital in Chicago. All parties and the court regarded her as mentally competent.

On November 24, 1993, Dr. James Meserow, a board-certified obstetrician/gynecologist and expert in the field of maternal/fetal medicine who is affiliated with the hospital, examined Doe for the first time. A series of tests he ordered performed on her suggested to Meserow that something was wrong with the placenta, and that the approximately 35-week, viable fetus was receiving insufficient oxygen. Meserow recommended immediate delivery by cesarean section, in his opinion the safest option for the fetus or, in the alternative, by induced labor. Informed of his recommendation, Doe told Meserow that, because of her personal religious beliefs, she would not consent to either procedure. Instead, given her abiding faith in God's healing powers, she chose to await natural childbirth. Her husband agreed with her decision.

Doe was examined by Dr. Meserow again on December 8, and by Dr. Gautier from the University of Illinois at Chicago on Thursday, December 9. After consulting with Gautier, Meserow concluded that the condition of the fetus had worsened. Meserow advised Doe and her husband that due to the insufficient oxygen flow to the fetus, failure to provide an immediate delivery by cesarean section (Meserow no longer recommended inducement as an option) could result in the child being born dead or severely retarded. Doe reiterated her opposition to a cesarean section, based on her personal religious beliefs.

On December 8, 1993, Dr. Meserow and St. Joseph's Hospital contacted the office of the Cook County State's Attorney. That office filed a petition for adjudication of wardship of the fetus on December 9, seeking to invoke the jurisdiction of the Juvenile Court Act of 1987 (705 ILCS 405/1—1 *et seq.* (West 1992)), and asking that the hospital be appointed custodian of the fetus. The juvenile court judge appointed an assistant public defender as counsel for Doe and her husband. The judge, who expressed doubt as to whether the Juvenile

Court Act conferred jurisdiction over a fetus *in utero*, certified the question for immediate appeal to this court, and set the matter for hearing on Friday, December 10.

At approximately 5 p.m. on December 9, 1993, an assistant State's Attorney prevailed upon a judge of the Appellate Court, First District, to hear an emergency petition for leave to appeal pursuant to Supreme Court Rule 306 (134 Ill. 2d R. 306). Several assistant State's Attorneys and assistant public defenders, as well as Doe and her husband, met in the chambers of the judge for several hours. During this time calls were placed to medical personnel at St. Joseph's Hospital, and the attorneys and the judge spoke with doctors there. Arrangements were made for Doe, with her consent, to be examined at the University of Illinois Hospital for the purpose of getting a second opinion as to her condition. The meeting in chambers adjourned at about 9 p.m., with no formal rulings or orders entered.

On the next day, in an emergency hearing, the parties' attorneys appeared in chambers before a three-judge panel of this court, along with Doe's husband; Dr. Meserow; John Seibel, attorney for St. Joseph's Hospital; and counsel from the Roger Baldwin Foundation of the ACLU, Inc., seeking leave to appear as *amicus curiae*. Doe was not present; her husband explained that she was upset by the previous day's court proceedings and was at home resting in bed. No court reporter was present.

During the emergency hearing, the assistant State's Attorneys asked the court for an order forcing Doe to undergo an immediate cesarean section to deliver the fetus. Following argument, the majority of the panel, one judge dissenting, held that the appellate court lacked jurisdiction to hear the case because no order had yet been entered by the circuit court, and therefore remanded the case to the circuit court. The majority also suggested that jurisdiction would not lie under the Juvenile Court Act, and that an order compelling a pregnant woman to submit to an invasive procedure such as a cesarean section would violate her constitutional rights. The panel further advised the parties that it would remain available that day to hear any appeal that might be taken once the circuit court entered an order.

Later that afternoon, the juvenile court judge commenced the hearing on the issue of the circuit court's jurisdiction and whether an order compelling Doe to submit to surgery should issue. After oral argument from the parties' attorneys, the court ruled that the Juvenile Court Act does not apply to a fetus. The court held, however, that it had equity jurisdiction over the State's petition as a court of general jurisdiction and denied the public defender's motion to

dismiss the State's petition. The State then sought leave to file an amended petition, which was granted, and filed *instanter* its amended "Petition for Hearing on Whether a Temporary Custodian Can Be Appointed to Consent to a Medical Procedure: To Wit Cesarean Section."

Counsel for Doe and her husband moved to dismiss the amended petition, and the motion was denied.

Counsel from the Roger Baldwin Foundation of the ACLU, Inc. (ACLU), asked leave of court to appear as *amicus curiae* on behalf of Doe and her husband. The Cook County public guardian, Patrick T. Murphy, asked leave of court to appear as *amicus curiae* on behalf of the State. The court granted both motions. Subsequently, the public guardian asked to be appointed *guardian ad litem* for the fetus. The court granted this motion as well, over the objection of the public defender. Still later, Doe and her husband retained counsel from ACLU as their attorneys on appeal.

The hearing then proceeded on the amended petition. The State called Dr. Meserow as its only witness. Meserow testified that he could not ascertain whether the fetus was already injured or quantify the degree of risk to the fetus from continuing the pregnancy. He indicated that a fetus has some coping mechanisms to deal with decreased oxygen and that those mechanisms appeared to be functioning. In his expert opinion, the likelihood of injury to the fetus increased on a daily basis, and the chances that the fetus would survive a natural labor were close to zero. On cross-examination, Meserow further testified about the specific medical procedures involved in a cesarean section, and the serious risks and possible side effects to Doe of such procedures. Although he recommended a cesarean section as the safest mode of delivery for the fetus, Meserow was not advocating that the cesarean section be performed over Doe's objection.

Counsel for Doe and her husband called no witnesses, but entered into a stipulation with the State which was accepted by the court: Doe received the recommendation from the physicians, understood the risks and benefits of the proposed procedures and, in consultation with her husband, decided to await natural childbirth.

On December 11, 1993, the court heard closing arguments and then denied the State's petition. All three parties appearing in the case—the State, the public guardian, and Doe—submitted proposed findings, and the court entered all of them. Essentially the findings included the following:

1. The fetus is 36$^1$/$_2$ weeks and viable outside the womb.

2. The lungs of the fetus have worked independently for two weeks.

3. The child can live outside the womb without any assistance of medical technology.

4. Because of medical complications, the chances of the unborn child surviving natural childbirth (the process of labor) are close to zero.

5. If the child were to somehow survive natural childbirth, he would be retarded.

6. The unborn child suffers from placental insufficiency which means he is not receiving adequate oxygen and that during the process of labor the placenta will not deliver the needed oxygen and the child will die or suffer the death of the brain cells leaving him retarded. The child may have already suffered some damage.

7. The chances of the child surviving a C-section are close to 100% unless the child is already compromised or damaged.

8. The chances of the mother dying in a C-section delivery are about 1 in 10,000. In normal birth the odds of a mother's death are 1 in 20,000 to 1 in 50,000.

9. The mother will have much more pain due to a C-section delivery than birth from the laboring process. There are or could be other complicating factors such as damage to other organs.

10. The mother will also have to recuperate for about six weeks after a C-section, which is major surgery.

11. The mother has refused the C-section for reasons of religious beliefs and faith in God and healing procedures, and because of reasons set forth in a stipulation.

12. Because of the expedited nature of the proceedings, the court may not have had the opportunity to hear all witnesses who may have presented testimony concerning additional risks to the mother including additional pain and risk to the mother.

13. The parties presented many cases to the court but no Illinois case is on point. *Jefferson v. Griffin Spalding County Hospital Authority* (1981), 247 Ga. 86, 274 S.E.2d 457, and *In re A.C.* (D.C. 1990), 573 A.2d 1235, from other jurisdictions are informative though not dispositive.

14. The court has not seen any case where a court has forced medical care on an objecting, competent adult except for *Taft v. Taft*, which had to do with the orderly administration of a prison.

15. The court has seen no case that suggests that a mother or any other competent person has an obligation or responsibility to provide medically for a fetus, or for another person for that matter.

16. The court has found no case in Illinois nor seen any cases from the United States Supreme Court which mandate balancing tests by which a court balances, as in this case, the right to life of a viable person versus the right of the mother to choose a medical procedure which may cause death or other injury.

17. The court has jurisdiction under its general jurisdiction powers, but jurisdiction does not exist under the Juvenile Court Act.

18. This is a case of first impression in Illinois.

19. The mother is competent.

The court made the following conclusions of law in denying the State's request for an injunction:

"1. The Court has jurisdiction of this matter under its grant of general jurisdiction. The Juvenile Court Act is not applicable. A fetus is not a 'minor' within the meaning of the Act.

2. In the circumstances of this case, the state has failed to demonstrate that there is statutory or case law to support justifying the intrusive procedure requested herein by way of a court order against a competent person.

3. The Court denies the State's motion for an injunction.

4. There is no reason to delay an appeal of this matter and this is a final ruling."

The State and the public guardian filed notices of appeal on December 11, 1993, along with a motion for an immediate hearing. This court granted the motion for an expedited hearing on December 14, 1993, heard oral argument from all parties, and in a brief written order affirmed the judgment of the circuit court. In so doing, this court reserved the right to issue an opinion at some future date.

The public guardian petitioned the Illinois Supreme Court for leave to appeal. On December 16, 1993, the supreme court denied the petition (No. 76560). The public guardian then applied to the United States Supreme Court for an order remanding the matter to the circuit court of Cook County. That court, with one justice dissenting, denied the motion on December 18, 1993. (*Baby Boy Doe v. Mother Doe* (1993), 510 U.S. 1032, 126 L. Ed. 2d 610, 114 S. Ct. 652.) The Supreme Court subsequently denied *certiorari* on February 28, 1994 (510 U.S. 1168, 127 L. Ed. 2d 547, 114 S. Ct. 1198).

Doe vaginally delivered an apparently normal and healthy, although somewhat underweight, baby boy on December 29, 1993. The ACLU has since petitioned for the issuance of a written opinion, pointing out that the issue involved is serious and that the situation is likely to arise again, with little time for a circuit court to make an informed judgment. Cognizant of the seriousness of the question presented, and believing that the circuit courts of Illinois require some guidance in this area, this court issues the present opinion.

We initially point out that the State appealed from the denial of its petition of December 10, 1993, seeking the appointment of a temporary custodian for Doe, solely to consent to the performance of a cesarean section. Since it withdrew its earlier petition for an

adjudication of wardship under the Juvenile Court Act, alleging that the unborn fetus was neglected, that issue was not before this court. We therefore did not decide if a fetus is a minor covered by the Act and will not address that issue in this opinion.

In its appeal, the public guardian requested that this court reverse the order of the circuit court, and enter an order upon Doe directing her to have a cesarean section forthwith so that the baby could be delivered. The public guardian strenuously opposed any effort to use force or any other means to compel Doe to have the surgery, but would have reserved the right to file a rule to show cause why she should not be held in contempt if she had refused and the baby had been born either dead or severely retarded.

In its appeal, the State requested this court to reverse the circuit court's denial of its petition to appoint a temporary custodian for Doe, for the sole purpose of consenting to a cesarean section only during the birthing process. It, too, opposed the use of force.

Both the State and the public guardian argued that the circuit court should have balanced the rights of the unborn but viable fetus which was nearly at full term and which, if the uncontradicted expert testimony of the physicians had been accurate, would have been born dead or severely retarded if Doe delivered vaginally, against the right of the competent woman to choose the type of medical care she deemed appropriate, based in part on personal religious considerations. We hold today that Illinois courts should not engage in such a balancing, and that a woman's competent choice in refusing medical treatment as invasive as a cesarean section during her pregnancy must be honored, even in circumstances where the choice may be harmful to her fetus.

■ It cannot be doubted that a competent person has the right to refuse medical treatment. The Illinois Supreme Court summed up American attitude and law on this issue very well in *In re Estate of Longeway*: " 'No right is more sacred, or is more carefully guarded by the common law, than the right of every individual to the possession and control of [the individual's] own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law.' " (*In re Estate of Longeway* (1989), 133 Ill. 2d 33, 44, 549 N.E.2d 292, 297, quoting *Union Pacific Ry. Co. v. Botsford* (1891), 141 U.S. 250, 251, 35 L. Ed. 734, 737, 11 S. Ct. 1000, 1001.) Thus, " '[e]very human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body; and a surgeon who performs an operation without his [or her] patient's consent commits an assault for which he [or she] is liable in damages.' " *Longeway*, 133 Ill. 2d at 44, quoting *Schloendorff v. Society of New York Hospital* (1914), 211 N.Y. 125, 129-30, 105 N.E. 92, 93.

In Illinois the common law protects the right of a competent individual to refuse medical treatment. (See, *e.g.*, *In re E.G.* (1989), 133 Ill. 2d 98, 106,. 549 N.E.2d 322 (mature minor may exercise right to refuse treatment); see also *In re Estate of Greenspan* (1990), 137 Ill. 2d 1, 18, 558 N.E.2d 1194 (right to refuse medical treatment belongs equally to competent and incompetent persons, the latter of whom may exercise the right through a guardian pursuant to the doctrine of substituted judgment); *Longeway*, 133 Ill. 2d at 45 (same).) Moreover, the right to withhold consent and refuse treatment "incorporates all types of medical treatment, including life-saving or life-sustaining procedures," demonstrating that the right to refuse treatment does not depend upon whether the treatment is perceived as risky or beneficial to the individual. *Longeway*, 133 Ill. 2d at 45.

The United States Supreme Court, in *Cruzan v. Director, Missouri Department of Health* (1990), 497 U.S. 261, 278, 111 L. Ed. 2d 224, 241, 110 S. Ct. 2841, 2851, held that the due process clause of the fourteenth amendment confers a significant liberty interest in avoiding unwanted medical procedures. Concurring with the majority opinion, Justice O'Connor stated that the liberty guaranteed by the due process clause must protect, if it protects anything, an individual's "deeply personal" decision to reject medical treatment. "Because our notions of liberty are inextricably entwined with our idea of physical freedom and self- determination, the Court has often deemed state incursions into the body repugnant to the interests protected by the Due Process Clause." *Cruzan*, 497 U.S. at 287, 111 L. Ed. 2d at 248, 110 S. Ct. at 2856 (O'Connor, J., concurring).

The Illinois Supreme Court has acknowledged that the State right of privacy protects substantive fundamental rights, such as the right to reproductive autonomy. (*Family Life League v. Department of Public Aid* (1986), 112 Ill. 2d 449, 454, 493 N.E.2d 1054.) Further, the court has conceptually linked the right to privacy with the right of bodily integrity. In *Stallman v. Youngquist* (1988), 125 Ill. 2d 267, 275, 531 N.E.2d 355, 360, the supreme court refused to recognize a tort action against a mother for unintentional infliction of prenatal injuries because it would subject the woman's every act while pregnant to State scrutiny, thereby intruding upon her rights to privacy and bodily integrity, and her right to control her own life.

Religious liberty, protected by both the Federal and Illinois Constitutions, similarly requires that a competent adult may refuse medical treatment on religious grounds. In *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 205 N.E.2d 435, the Illinois Supreme Court held that an adult may refuse medical treatment on religious grounds even under circumstances where treatment is required to save the

patient's life. In that case, an adult Jehovah's Witness was rendered temporarily incompetent by a life-threatening medical condition. Despite a previously expressed wish not to be transfused with blood products, a conservator was appointed to consent to transfusions. The State argued that society's interest in preserving life outweighs a patient's right to the free exercise of religion. The Illinois Supreme Court disagreed, out of a recognition that religious liberty and the right to determine one's own destiny are among the rights "most valued by civilized man." (*Brooks*, 32 Ill. 2d at 374.) As such, an individual's free exercise of religion may be limited only "where such exercise endangers, clearly and presently, the public health, welfare or morals." (*Brooks*, 32 Ill. 2d at 372.) Recognizing that the decision to refuse medical treatment is a matter of individual conscience and not a question of public welfare, the court concluded:

> "Even though we may consider appellant's beliefs unwise, foolish or ridiculous, in the absence of an overriding danger to society we may not permit interference therewith *** for the sole purpose of compelling her to accept medical treatment forbidden by her religious principles, and previously refused by her with full knowledge of the probable consequences." *Brooks*, 32 Ill. 2d at 373.

The right of a competent adult to refuse medical treatment inconsistent with his or her religious beliefs was reaffirmed in *Baumgartner v. First Church of Christ, Scientist* (1986), 141 Ill. App. 3d 898, 490 N.E.2d 1319, *cert. denied* (1986), 479 U.S. 915, 93 L. Ed. 2d 290, 107 S. Ct. 317.

Particularly important to our supreme court's holding in *Stallman* was the recognition that the relationship between a pregnant woman and a fetus is unique, and

> "unlike the relationship between any other plaintiff and defendant. No other plaintiff depends exclusively on any other defendant for everything necessary for life itself. No other defendant must go through biological changes of the most profound type, possibly at the risk of her own life, in order to bring forth an adversary into the world. It is, after all, the whole life of the pregnant woman which impacts on the development of the fetus. *** [I]t is the mother's every waking and sleeping moment which, for better or worse, shapes the prenatal environment which forms the world for the developing fetus. That this is so is not a pregnant woman's fault; it is a fact of life." (*Stallman*, 125 Ill. 2d at 278-79.)

Appreciating the fact that "[t]he circumstances in which each individual woman brings forth life are as varied as the circumstances of each woman's life," the court strongly suggested that there can be no consistent and objective legal standard by which to judge a woman's actions during pregnancy. *Stallman*, 125 Ill. 2d at 279.

Applied in the context of compelled medical treatment of pregnant women, the rationale of *Stallman* directs that a woman's right to refuse invasive medical treatment, derived from her rights to privacy, bodily integrity, and religious liberty, is not diminished during pregnancy. The woman retains the same right to refuse invasive treatment, even of lifesaving or other beneficial nature, that she can exercise when she is not pregnant. The potential impact upon the fetus is not legally relevant; to the contrary, the *Stallman* court explicitly rejected the view that the woman's rights can be subordinated to fetal rights. *Stallman*, 125 Ill. 2d at 276.

In Illinois a fetus is not treated as only a part of its mother. (*Stallman*, 125 Ill. 2d at 276.) It has the legal right to begin life with a sound mind and body, assertable against third parties after it has been born alive. (*Stallman*, 125 Ill. 2d at 275.) This right is not assertable against its mother, however, for the unintentional infliction of prenatal injuries. (*Stallman*, 125 Ill. 2d at 280.) A woman is under no duty to guarantee the mental and physical health of her child at birth, and thus cannot be compelled to do or not do anything merely for the benefit of her unborn child. The public guardian's argument that this case is distinguishable from *Stallman* because Doe's actions amounted to *intentional* infliction of prenatal injuries is not persuasive.

The court of appeals for the District of Columbia has held that a woman's competent choice regarding medical treatment of her pregnancy must be honored, even under circumstances where the choice may be fatal to the fetus. (*In re A.C.* (D.C. 1990), 573 A.2d 1235.) The appellate court, reviewing the case *en banc*, vacated the lower court's order, which had required a pregnant, dying woman to undergo a cesarean section because the fetus was potentially viable. The lower court, after first ruling that it could not determine the woman's wishes because it questioned her competency, then reached its decision by balancing the fetus' rights against the woman's rights. The appellate court held that the lower court's approach was erroneous. Instead of balancing, the appellate court instructed, the lower court should have ascertained the woman's wishes by means of the doctrine of substituted judgment. The woman's decision, not the fetus' interest, is the only dispositive factor. If the woman is competent and makes an informed decision, that decision will control "in virtually all cases." (*In re A.C.*, 573 A.2d at 1237, 1249.) While not deciding the question, the court expressed some doubt as to whether there could ever be a situation extraordinary or compelling enough to justify a massive intrusion into a person's body, such as a cesarean section, against that person's will. (*In re A.C.*, 573 A.2d at 1252.) The

public guardian's argument, that this case represents such a situation, is unpersuasive. The *In re A.C.* court declined to express an opinion with regard to the circumstances, if any, in which lesser invasions (such as a blood transfusion) might be permitted over the woman's refusal. *In re A.C.*, 573 A.2d at 1246 n.10.

Two courts have held otherwise, ordering forced cesarean sections against pregnant women. The supreme court of Georgia, in *Jefferson v. Griffin Spalding County Hospital Authority* (1981), 247 Ga. 86, 274 S.E.2d 457, balanced the rights of the viable fetus against the rights of the mother and determined that an expectant mother in the last weeks of pregnancy lacks the right of other persons to refuse surgery or other medical treatment if the life of the unborn child is at stake. The superior court of the District of Columbia followed the same logic and came to the same conclusion in *In re Madyun* (D.C. Super. Ct. July 26, 1986), 114 Daily Wash. L. Rptr. 2233, Appendix to *In re A.C.*, 573 A.2d at 1259.

Those decisions, however, are contrary to the rationale of both *Stallman*, the controlling law in this jurisdiction, and *In re A.C.*, which hold that the rights of the fetus should not be balanced against the rights of the mother. Additionally, neither the *Jefferson* nor the *Madyun* court recognized the constitutional dimension of the woman's right to refuse treatment or the magnitude of that right. The supreme judicial court of Massachusetts, in *Taft v. Taft* (1983), 388 Mass. 331, 446 N.E.2d 395, when faced with a similar circumstance, vacated a lower court's order compelling a surgical procedure upon a pregnant woman because the lower court failed to recognize the woman's constitutional right to privacy, and the record did not present circumstances so compelling as to override the right to religious freedom for pregnant Jehovah's Witnesses.

The public guardian's reliance on *Raleigh Fitkin-Paul Morgan Memorial Hospital & Ann May Memorial Foundation v. Anderson* (1964), 42 N.J. 421, 201 A.2d 537, *cert denied* (1964), 377 U.S. 985, 12 L. Ed. 2d 1032, 84 S. Ct. 1894, is also misplaced. In that case, the supreme court of New Jersey held that the unborn child of a woman who did not wish to have blood transfusions because they were against her religious convictions as a Jehovah's Witness was entitled to the law's protection, and an order was entered to ensure a transfusion in the event that the physician in charge determined that one was necessary to save the woman's life or the life of the child. This and other similar blood transfusion cases are inapposite, because they involve a relatively noninvasive and risk-free procedure, as opposed to the massively invasive, risky, and painful cesarean section. Whether such noninvasive procedures are permissible in Illinois, we leave for another case.

Federal constitutional principles prohibiting the balancing of fetal rights against maternal health further bolster a woman's right to refuse a cesarean section. In *Thornburgh v. American College of Obstetricians & Gynecologists* (1986), 476 U.S. 747, 90 L. Ed. 2d 779, 106 S. Ct. 2169, the United States Supreme Court struck down a Pennsylvania statute which required that in cases of post-viability abortions, permitted under State law only when necessary to save the woman's life or health, a physician must use the abortion technique providing the best opportunity for the fetus to be aborted alive. The Supreme Court, finding the statute unconstitutional for requiring a "trade-off" between the woman's health and fetal survival, stressed that the woman's health is always the paramount consideration; any degree of increased risk to the woman's health is unacceptable. *Thornburgh*, 476 U.S. at 769, 90 L. Ed. 2d at 799, 106 S. Ct. at 2183.

A cesarean section, by its nature, presents some additional risks to the woman's health. When the procedure is recommended solely for the benefit of the fetus, the additional risk is particularly evident. It is impossible to say that compelling a cesarean section upon a pregnant woman does not subject her to additional risks—even the circuit court's findings of fact in this case indicate increased risk to Doe. Under *Thornburgh*, then, it appears that a forced cesarean section, undertaken for the benefit of the fetus, cannot pass constitutional muster.

Courts in Illinois and elsewhere have consistently refused to force one person to undergo medical procedures for the purpose of benefiting another person—even where the two persons share a blood relationship, and even where the risk to the first person is perceived to be minimal and the benefit to the second person may be great. The Illinois Supreme Court addressed this issue in *Curran v. Bosze* (1990), 141 Ill. 2d 473, 566 N.E.2d 1319, where it refused to compel twin minors to donate bone marrow to a half-sibling, despite the fact that the procedures involved would pose little risk to the twins, and the sibling's life depended on the transplant. Nor would the court compel the minors to undergo even a blood test for the purpose of determining whether they would be compatible donors. If a sibling cannot be forced to donate bone marrow to save a sibling's life, if an incompetent brother cannot be forced to donate a kidney to save the life of his dying sister (*In re Guardianship of Pescinski* (1975), 67 Wis. 2d 4, 226 N.W.2d 180), then surely a mother cannot be forced to undergo a cesarean section to benefit her viable fetus.

The public guardian argues that *Roe v. Wade* (1973), 410 U.S. 113, 163, 35 L. Ed. 2d 147, 182-83, 93 S. Ct. 705, 731-32, seems to

imply that a viable fetus does have some rights. *Roe*, however, merely stated that, in the context of abortion, the State's interest in the potential life of the fetus becomes compelling at the point of viability, and therefore the State is permitted to prohibit post-viability abortions, except where necessary to preserve the life or health of the woman. The fact that the State may prohibit post-viability pregnancy terminations does not translate into the proposition that the State may intrude upon the woman's right to remain free from unwanted physical invasion of her person when she chooses to carry her pregnancy to term. *Roe* and its progeny, in particular *Planned Parenthood v. Casey* (1992), 505 U.S. 833, 120 L. Ed. 2d 674, 112 S. Ct. 2791, make it clear that, even in the context of abortion, the State's compelling interest in the potential life of the fetus is insufficient to override the woman's interest in preserving her health.

■ Courts generally consider four State interests—the preservation of life, the prevention of suicide, the protection of third parties, and the ethical integrity of the medical profession—in considering whether to override competent treatment decisions. (See, *e.g., Longeway*, 133 Ill. 2d at 48; *In re A.C.*, 573 A.2d at 1246; *Superintendent of Belchertown State School v. Saikewicz* (1977), 373 Mass. 728, 370 N.E.2d 417; *Satz v. Perlmutter* (Fla. 1980), 379 So. 2d 359, *aff'g* (Fla. App. 1978), 362 So. 2d 160.) None of those State interests justifies overriding Doe's decision here.

The first two interests—the preservation of life and the prevention of suicide—are simply irrelevant here. Although it might be argued that the State has an interest in the preservation of the potential life of the fetus, courts have traditionally examined the refusal of treatment as it impacts upon the preservation of the life of the maker of the decision. The proposed cesarean section was never suggested as necessary, or even useful, to the preservation of Doe's life or health. To the contrary, it would pose greater risk to her. Further, even in cases where the rejected treatment is clearly necessary to sustain life, these factors alone are not sufficiently compelling to outweigh an individual's right to refuse treatment. See, *e.g., Holmes v. Silver Cross Hospital* (N.D. Ill. 1972), 340 F. Supp. 125, 130; *In re E.G.* (1989), 133 Ill. 2d 98, 549 N.E.2d 322; *Longeway*, 133 Ill. 2d at 36.

Similarly, the third interest—the protection of third parties—is also irrelevant here. The "third parties" referred to in this context are the family members, particularly the children, of the person refusing treatment. Where an individual's decision to refuse treatment will result in orphaning an already born child, courts have indicated that this is one factor they might consider. (*In re Estate of Brooks* (1965), 32 Ill. 2d 361, 372-73, 205 N.E.2d 435; *Wons v. Public Health*

*Trust* (Fla. App. 1987), 500 So. 2d 679, *approved, certified question answered* (Fla. 1989), 541 So. 2d 96; *In re Application of Winthrop University Hospital For an Order Authorizing Medical Treatment of Susan Hess* (1985), 128 Misc. 2d 804, 490 N.Y.S.2d 996.) At least one court has hinted that, although it would not permit the overriding of a Jehovah's Witness' competent decision to refuse a possibly required blood transfusion subsequent to an accepted cesarean section because the fetus would not be at risk, it might override such a competent decision if it was medically determined that the fetus would be at risk before birth because of the refusal. (*Mercy Hospital, Inc. v. Jackson* (1985), 62 Md. App. 409, 489 A.2d 1130, *vacated & remanded* (1986), 306 Md. 556, 510 A.2d 562.) Such was also the approach taken in New Jersey in *Anderson,* but, as discussed above, a court's decision regarding a forced transfusion cannot be persuasive in a case involving a forced cesarean section.

The final factor—the ethical integrity of the medical profession—weighs in Doe's favor, rather than that of the State or the public guardian. In the ethical opinions and recommendations it has issued, the medical profession strongly supports upholding the pregnant woman's autonomy in medical decision making. (See, *e.g., Legal Interventions During Pregnancy: Court Ordered Medical Treatments and Legal Penalties for Potentially Harmful Behavior by Pregnant Women,* 264 J.A.M.A. 2663, 2670 (1990) (cited by Doe, who included a copy in her brief).) The American Medical Association's board of trustees cautions that the physician's duty is not to dictate the pregnant woman's decision, but to ensure that she is provided with the appropriate information to make an informed decision. If the woman rejects the doctor's recommendation, the appropriate response is not to attempt to force the recommended procedure upon her, but to urge her to seek consultation and counseling from a variety of sources. In this case, then, the actions taken by the medical professionals appear to be inconsistent with the ethical position taken by the profession.

Of not insignificant concern in this case is how a forced cesarean section would be carried out. The public guardian specifically opposed any effort to use force or other means to compel Doe to have the surgery; the State also opposed the use of force. Thus, we have been asked to issue an order that no one expects to be carried out. This court, as a simple matter of policy, will not enter an order that is not intended to be enforced.

If such an order were to be carried out, what would be the circumstances? The *In re A.C.* court considered such a question, and concluded:

"Enforcement could be accomplished only through physical force or its equivalent. A.C. would have to be fastened with restraints to the operating table, or perhaps rendered unconscious by forcibly injecting her with an anesthetic, and then subjected to unwanted major surgery. Such actions would surely give one pause in a civilized society, especially when A.C. had done no wrong." (*In re A.C.*, 573 A.2d at 1244 n.8.)

An even more graphic description of what actually happened when a forced cesarean section was carried out may be found in Gallagher, *Prenatal Invasions & Interventions: What's Wrong With Fetal Rights*, 10 Harv. Women's L.J. 9, 9-10 (1987). We simply cannot envision issuing an order that, if enforced at all, could be enforced only in this fashion.

For all the reasons given above, we affirm the decision of the circuit court.

Affirmed.

HARTMAN and McCORMICK, JJ., concur.